**CITIZENS ASSOCIATION OF GEORGE-TOWN, INC., Petitioner,**

**v.**

**DISTRICT OF COLUMBIA ZONING COMMISSION, Respondent,**

**Safeway Stores Incorporated, Intervenor.**

**No. 12547.**

District of Columbia Court of Appeals.

Argued June 13, 1978.

Decided May 14, 1979.

---

Courts Oulahan, Washington, D. C., for petitioner.

Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., entered an appearance for respondent. No brief was filed.

Arthur B. Hanson, Washington, D. C., with whom Alexander W. Whitaker, Washington, D. C., was on brief, for intervenor.

Before NEWMAN, Chief Judge, FERREN, Associate Judge, and MURPHY, Associate Judge, Superior Court of the District of Columbia.*

FERREN, Associate Judge:

The District of Columbia Zoning Commission adopted a zoning map amendment (commercial C–1) to facilitate enlargement of a Safeway store on Wisconsin Avenue in Georgetown. The petitioner, Citizens Association of Georgetown, Inc., raises two substantial questions: (1) Did the Commission engage in illegal "spot zoning"? (2) Do the Commission's findings of fact and conclusions of law fail to satisfy the requirements of the District of Columbia Administrative Procedure Act (DCAPA), D.C.Code 1978 Supp., § 1–1501 *et seq.*? We answer "no" to both questions and affirm the Commission's order.

## I. *The Facts; Proceedings to Date*

On February 6, 1976, Safeway Stores, Incorporated filed an application for a zoning map amendment with the District of Columbia Zoning Commission. Intending to raze its supermarket at 1855 Wisconsin Avenue, N.W., and build a larger store on the same property at a greater setback distance from the street—with a 210-space parking lot in front—Safeway sought rezoning of parts of Lots 318 and 1009, Square 1299, from residential R–1–B to commercial C–2–A.

Over a six-month period between November 18, 1976 and May 12, 1977, the Commission conducted five days of public hearings under Part II of its Rules of Practice and Procedure, 20 DCRR §§ 2.1–2.7. *See Palisades Citizens Association v. Zoning Commission,* D.C.App., 368 A.2d 1143, 1147 (1977). During the course of the proceeding, voluminous evidence, both testimonial and documentary, was presented by Safeway, its planning consultants, the District

* Sitting by designation pursuant to D.C.Code 1973, § 11–707(a).

of Columbia's Municipal Planning Office, the District's Departments of Economic Development, Environmental Services, and Transportation, Advisory Neighborhood Commissions 3A and 3B, the Citizens Association of Georgetown, Inc. (Georgetown Citizens), other citizens associations and several interested individuals.

The Department of Economic Development supported the request because of the anticipated increase in tax base and enhancement of food services for the city. The Department of Environmental Services anticipated no adverse impact on solid waste disposal services, but, claiming inadequate information, was noncommittal about the likely effect on storm and sanitary sewer facilities (which were then adequate). The Municipal Planning Office, however, told the Commission later that "DES does not anticipate any problems in providing additional [storm and sanitary] service to this site." The Department of Transportation, taking somewhat contradictory stances with regard to the probable traffic impact, eventually concluded that it could find no reason to object.

Georgetown Citizens opposed the request, advancing contrary traffic data and analysis, as well as evidence of citizen opposition based on a perceived adverse impact upon orderly land development in Georgetown.

After the close of the hearings, the Commission submitted a modified map amendment (commercial C–1 rather than C–2–A) to the National Capital Planning Commission (NCPC) for review and comment, as required by D.C.Code 1978 Supp. § 5–417.[1] NCPC replied that such rezoning would not negatively "impact on the interests of the Federal Establishment as they relate to the Georgetown Historical District," and that development on the site should be carried out in accordance with a specified, amended site plan.

On August 11, 1977, the Commission issued its order in the case. After presenting findings of fact and conclusions of law, the Commission granted C–1 rezoning to portions of Lot 318 (previously zoned R–1–B and C–2–A) and Lot 1009 (previously zoned R–1–B). The Commission considered the C–1 classification adequate to meet Safeway's proposed floor space needs. On September 8, 1977, Georgetown Citizens filed this petition for review, pursuant to the DCAPA, and unsuccessfully sought a stay from this court pending resolution of the merits.

## II. *Spot Zoning*

Petitioner maintains, first, that the commercial rezoning intrudes into a residential area solely for the benefit of the applicant, Safeway, and therefore constitutes illegal "spot zoning."[2] We disagree.

■ Contrary to petitioner's assertions— and unlike Maryland, see *Clayman v. Prince George's County,* 266 Md. 409, 417–418, 292 A.2d 689, 693–94 (1972)—this jurisdiction has rejected the "change-mistake" doctrine in assessing the propriety of zoning map amendments. *Rock Creek East Neighborhood League, Inc. v. Zoning Commission,* D.C.App., 388 A.2d 450, 451 (1978) *(per curiam); Palisades, supra* at 1146. We have refused to presume the validity of original zoning actions, favoring instead a "presumption of regularity" of both original and "subsequent actions" by the Zoning Commission. *Palisades, supra* at 1146 n.9. Thus, neither a showing of mistake in the original zoning nor a demonstration of substantial change in the area since the time of such zoning is necessary to justify amendment of the zoning map.

■ We agree with petitioner, however, that the Commission may not spot zone. *See id.* at 1147. To constitute illegal spot zoning, the Commission's action (1) must pertain to a single parcel or a limited area—ordinarily for the benefit of a particular property owner or specially interested

---

1. Apparently at the suggestion of the Municipal Planning Office, the Commission modified Safeway's C–2–A proposal to a more restrictive C–1 commercial zone.

2. This charge also was made by other witnesses during the course of the Commission hearings.

party—and (2) must be inconsistent with the city's comprehensive plan, or if there is none, with the character and zoning of the surrounding area, or the purposes of zoning regulation, *i. e.,* the public health, safety, and general welfare. *See Palisades, supra* at 1147; *Clark v. City of Boulder,* 146 Colo. 526, 531, 362 P.2d 160, 162 (1961); *Furtney v. Simsbury Zoning Commission,* 159 Conn. 585, 600–01, 271 A.2d 319, 326 (1970); *Schneider v. Calabrese,* 5 Pa.Cmwlth. 444, 456–57, 291 A.2d 326, 332 (1972). Spot zoning, accordingly, refers to a small parcel "wrenched" from its environment. *See Furtney, supra,* 159 Conn. at 600, 271 A.2d at 326; *Schneider, supra,* 5 Pa.Cmwlth. at 456, 291 A.2d at 332.

■ It is true that the zoning action in this case relates to a one-owner parcel in a manner clearly beneficial to that owner— the first indication of spot zoning. The facts here, however, do not satisfy the second indication, for three reasons. First, in our recent decision in *Citizens Association of Georgetown v. Zoning Commission,* D.C.App., 392 A.2d 1027 (1978) (en banc), we held that the District of Columbia presently does not have a comprehensive plan, as such; the comprehensive plan anticipated by D.C.Code 1978 Supp., § 5–414 has not been formulated. *Id.* at 1035–36. In the meantime, therefore, zoning in accordance with the comprehensive plan means zoning " 'on a uniform and comprehensive basis.' " *Id.* at 1036 (citing *Citizens Association of Georgetown v. Zoning Commission,* 155 U.S. App.D.C. 233, 237–38, 477 F.2d 402, 406–07 (1973)). We conclude that the map amendment adopted in this case is not contrary to this general mandate.

■ Second, we have examined the record concerning Safeway's Wisconsin Avenue location, with a particular focus on the commercial strip which lines that traffic artery. There is sufficient evidentiary support for the Commission's view that the rezoned property is not out of character with the surroundings. Indeed, the Municipal Planning Office reported to the Commission that the area along Wisconsin Avenue near the site, although zoned C–2–A, has developed as a mixture of offices and stores of approximately C–1 density. The evidence supports the Commission's view that the proposed greater depth of the commercial intrusion at the Safeway site is consistent with the existing environment.

■ Finally, the record does not belie the Commission's determination that the public health, safety, and general welfare goals of zoning regulation would be served by the C–1 amendment. There is ample evidence of record from which the Commission could find that the rezoning sought by Safeway would further the specific aims of the zoning statute. *See* D.C.Code 1978 Supp., § 5–414.[3]

■ In summary, while the C–1 amendment does affect a limited area to the advantage of a single owner, it is not out of harmony with the comprehensive plan, with the character of the surrounding property, or with the purposes of zoning regulation. The Commission's action, therefore, does not amount to illegal spot zoning; the Safeway property has not been "wrenched" from its surroundings.

---

3. D.C.Code 1978 Supp., § 5–414 delineates the purposes as follows:

Zoning maps and regulations, and amendments thereto, shall not be inconsistent with the comprehensive plan for the National Capital, and zoning regulations shall be designed to lessen congestion in the street, to secure safety from fire, panic, and other dangers, to promote health and the general welfare, to provide adequate light and air, to prevent the undue concentration of population and the overcrowding of land, and to promote such distribution of population and of the uses of land as would tend to create conditions favorable to health, safety, transportation, prosperity, protection of property, civic activity, and recreational, educational, and cultural opportunities, and as would tend to further economy and efficiency in the supply of public services. Such regulations shall be made with reasonable consideration, among other things, of the character of the respective districts and their suitability for the uses provided in the regulations, and with a view to encouraging stability of districts and of land values therein.

*See* D.C. Zoning Regulations § 1301.1.

III. *Adequacy of the Commission's Findings of Fact*

In support of the zoning map amendment adopted on August 11, 1977, the Commission issued findings of fact and conclusions of law, D.C.1978 Supp., § 1–1509(e), which are set forth as an appendix to this opinion.[4] Petitioner asserts, however, that the Commission "failed to make the requisite findings and conclusions on each material contested issue of fact"—an assertion embracing several issues.

A. *The "Substantial Evidence" Test—Generally*

■ The DCAPA, § 1–1509(e), requires that every agency decision shall be accompanied by written "[f]indings of fact and conclusions of law . . . supported by and in accordance with the reliable, probative, and substantial evidence."[5] Inherent in this "substantial evidence" test are three requirements: (1) there must be findings on "each contested issue of fact," § 1–1509(e); see *Dietrich v. Board of Zoning Adjustment,* D.C.App., 293 A.2d 470, 472–73 (1972); (2) the decision must rationally follow from the facts; *i. e.,* there must be a " 'rational connection between the facts

found and the choice made.' " *Brewington v. Board of Appeals & Review,* D.C.App., 299 A.2d 145, 147 (1973) (quoting *Burlington Trunk Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)); and (3) there must be sufficient evidence supporting each finding, *i. e.,* " 'more than a mere scintilla . . . such relevant evidence as a reasonable mind might accept as adequate . . . .' " *Vestry of Grace Parish v. Alcoholic Beverage Control Board,* D.C.App., 366 A.2d 1110, 1112 (1976) (citation omitted).[6] This three-fold test was articulated succinctly over 40 years ago by the United States Court of Appeals for the District of Columbia Circuit:

When a decision is [1] accompanied by findings of fact, the reviewing court can decide [2] whether the decision reached by the court or commission follows as a matter of law from the facts stated as its basis, and also [3] whether the facts so stated have any substantial support in the evidence. [*Saginaw Broadcasting Co. v. Federal Communications Commission,* 68 App.D.C. 282, 287, 96 F.2d 554, 559, *cert. denied,* 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391 (1938).][7]

4. We must evaluate the Commission's action under the "contested case" provision of the DCAPA, §§ 1–1509(e), because the Commission conducted hearings under Part II of its Rules of Practice and Procedure, 20 DCRR §§ 2.1–2.7. See *Palisades, supra* at 1147.

5. D.C.Code 1978 Supp., § 1–1509(e) provides in part:

Every decision and order adverse to a party to the case, rendered by the Mayor or an agency in a contested case, shall be in writing and shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact. Findings of fact and conclusions of law shall be supported by and in accordance with the reliable, probative, and substantial evidence.

6. See generally *Wheeler v. Board of Zoning Adjustment,* D.C.App., 395 A.2d 85, 88–89 (1978); *Jameson's Liquors, Inc. v. Alcoholic Bev. Cont. Bd.,* D.C.App., 384 A.2d 412, 418 (1978); *Kopff v. Alcoholic Bev. Cont. Bd.,* D.C. App., 381 A.2d 1372, 1386–87 (1977); *Dietrich, supra* at 472–73; *Robey v. Schwab,* 113 U.S.

App.D.C. 241, 244–45, 307 F.2d 198, 201–02 (1962).

The "substantial evidence" test has caused confusion. Whereas the words themselves suggest evaluation of the findings of fact for sufficient evidentiary support, they do not additionally imply the "rational connection" requirement, *i. e.,* analysis of whether inferences to be drawn from the findings reasonably lead to the agency decision. See 2 F. Cooper, State Administrative Law 725 (1965). As indicated in our decisions, however, the "rational connection" requirement is central to judicial review of an agency decision and is implicit in the statutory requirement that "findings of fact and conclusions of law [and thus the decision itself] shall be supported by *and in accordance with* the reliable, probative, and substantial evidence." D.C.Code 1978 Supp., § 1–1509(e) (emphasis added); see *Washington Pub. Interest Org. v. Public Serv. Comm'n,* D.C.App., 393 A.2d 71, 77 (1978).

7. On another occasion we summarized the same analytic process, in a different order, as follows:

[T]he facts adduced and found must flow rationally from the evidence presented and in

In reviewing an agency's findings and conclusions, it is important for the court to keep in mind that the agency reaches its decision by moving along a continuum from unassimilated, often contradictory testimony to "findings of fact" to "conclusions of law," which are usually expressed in terms of the statutory criteria governing the decision. The difference between such findings and conclusions, therefore, is one of degree—from specific to general—not a difference of kind. For this reason, conclusions of law are sometimes referred to as "ultimate facts." *Miller v. Commission on Human Rights,* D.C.App., 339 A.2d 715, 719 n.5 (1975); *Saginaw Broadcasting Co., supra,* 68 App.D.C. at 287–89, 96 F.2d at 559–61.

Although the record of a proceeding may disclose a substantial amount of evidence which supports the agency's decision, a recurring problem in agency decision-making has been a fatal omission of fact-finding along the continuum between testimony and final decision. As this court noted in one of its first cases dealing with the problem, "[s]ometimes, . . . an agency merely summarizes the testimony of all the witnesses, and then (implying that the testimony in ways not particularized supports its conclusions) sets forth the ultimate conclusions of fact and law in statutory language." *Dietrich, supra* at 473 n.4.[8] In *Dietrich,* therefore, we responded to this fact-finding gap by underscoring the first requirement of § 1–1509(e): there must be one or more affirmative, written findings on "each [material] contested issue of fact."[9] The court cannot properly fill the gap itself by inferring findings on a party's objections through inspection of the record, the agency's other findings, and the ultimate decision. *Dietrich, supra* at 472. We

concluded, rather, that the agency's own findings

must support the end result in a discernible manner, and the result reached must be supported by *subsidiary findings of basic facts on all material issues.* [*Id.* at 473 (emphasis added).]

Earlier the same year we had made the same point: an agency must make "findings of fact of a *basic or underlying nature* necessary to a determination of the ultimate facts, [*i. e.,* conclusions of law] usually stated in terms of the statutory criteria" *Palmer v. Board of Zoning Adjustment,* D.C.App., 287 A.2d 535, 538 (1972) (emphasis added). And again: the DCAPA requires "findings of *basic facts, the essential facts* on which the decision rests. The Commission must show on what it relied in reaching its decision." *Miller, supra* at 719 (citations omitted) (emphasis added). *See generally Aquino v. Knox,* D.C.Mun.App., 60 A.2d 237, 240 (1948); *Saginaw Broadcasting Co., supra* 68 App.D.C. at 287–89, 98 F.2d at 559–61.

In summary, the DCAPA "substantial evidence" test requires (1) the agency to make written findings of "basic facts" on all material contested issues; (2) these findings, taken together, must rationally lead to conclusions of law ("ultimate facts") which, under the governing statute, are legally sufficient to support the agency's decision; and (3) each basic finding must be supported by evidence sufficient to convince reasonable minds of its adequacy.

B. *Application of the Substantial Evidence Test to the Facts of This Case*

(1) *Findings of "basic facts" on each material contested issue*

The Commission did make findings with respect to all three issues of fact still con-

---

turn the conclusions of law must reasonably and rationally be drawn from such findings. [*A.L.W. Inc. v. Board of Zoning Adjustment,* D.C.App., 338 A.2d 428, 430 (1975); *see Smith v. Board of Zoning Adjustment,* D.C. App., 342 A.2d 356, 358–60 (1975).]

8. *See Newsweek Magazine v. Commission on Human Rights,* D.C.App., 376 A.2d 777, 784 (1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978); *Communications Work-*

ers v. Commission on Human Rights, D.C.App., 367 A.2d 149, 152–53 (1976); *Shay v. Board of Zoning Adjustment,* D.C.App., 334 A.2d 175, 176–77 (1975).

9. Petitioner acknowledges that the required findings are limited to material contested issues of fact, for not every factual issue injected by a party is germane to the decision. *See Wheeler, supra* at 88–89; *Dietrich, supra* at 473.

tested on appeal: (1) the "other development projects expected in the area" (Finding 4); (2) the adequacy of "city services available to . . . the Safeway site" (Finding 5); and (3) the impact of anticipated "traffic" on the "existing street system" (Finding 6). Accordingly, this is not a case, such as *Smith, supra* and *Dietrich, supra,* in which findings on one or more contested issues are altogether missing.[10]

Nonetheless, petitioner argues that Finding 4 is incomplete; one or more basic facts inherent in the "other development projects" issue are missing. Although the Commission acknowledges in Finding 4 that "[o]ther development projects [are] expected in the area," such as the Russian Embassy and Chancery, the French Embassy and Chancery, a new Holiday Inn, and additions to the Georgetown University Hospital, petitioner faults that finding because it does not, in addition, "disclose the size of these projects and their effect upon traffic, in conjunction with the proposed super Safeway." It is clear, as petitioner contends, that the Commission deemed the impact of the other development projects material to consideration of Safeway's proposals; and it is true that the Commission provides no explicit finding as to how these other projects bear on the matter here. We conclude, nevertheless, that petitioner's complaint falls short. The Commission has provided all the required basic facts.

■ The contested issue of fact is the impact of the proposed Safeway on traffic under all anticipated circumstances, including the completion of other proposed development projects in the area. Finding 6 is wholly responsive to that issue in stating that the traffic "to be generated by the

new food store can be accommodated by the existing street system." We understand the Commission to be saying that the proposed Safeway is part of a development trend (reflected in Finding 4 on other anticipated projects), and that even when account is taken of the other projects for which no further zoning action or other approval is required, *e. g.,* the Georgetown University Hospital and the Russian Embassy and Chancery, the Safeway project will not overtax the city street system.[11] As to anticipated projects for which zoning action is not complete, however, *e. g.,* the French Embassy and Chancery and the Holiday Inn, we note that the zoning authorities will have to consider them later in light of Safeway, not vice versa; Safeway's application cannot be prejudiced by other anticipated but unapproved development. To some extent, therefore, the impact of other anticipated development is legally irrelevant.

In summary, the significance of Finding 4 is actually covered by Finding 6 on traffic. Amplification of Finding 4 with explanatory facts is not indispensable to the Commission's decision. We nevertheless add a cautionary comment. Were it not for petitioner's position that the significance of the other projects pertains only to traffic, on which a separate, unequivocal finding has been made, our conclusion might be different.[12]

### (2) *The "rational connection" requirement*

It is open to a petitioner to argue that even if an agency's findings of basic fact cover each material contested issue and are supported by sufficient evidence, they do

---

10. The provision of § 1–1509(e) requiring findings on "each contested issue of fact" refers to issues contested before the agency itself. On appeal, of course, we deal only with issues of fact which are still contested; we thus assume the validity of findings and conclusions unquestioned by the petitioner.

11. There is sufficient evidentiary support for this proposition. One expert pointed out, for example, that the Russian Chancery would not have a significant impact on traffic during peak

hours because its personnel will live as well as work there.

12. Petitioner also contends, in connection with Finding 4, that the Commission improperly failed to consider certain other anticipated projects related to Georgetown University and the Georgetown waterfront. Petitioner, however, does not make a showing of record that such projects are material to the decision. *See* note 9 *supra.*

not rationally lead to the conclusions of law and a lawful agency decision. Georgetown Citizens, the petitioner here, does not make this argument. Thus, Gerogetown Citizens must be said implicitly to agree that if the challenged findings are complete and valid—*i. e.,* if the "city services" are "adequate" *for the new Safeway store and if,* considering the "other development projects" expected in the area, the anticipated traffic "can be accommodated by the existing street system"—then the Commission has found enough basic facts, rationally connected to the decision and supported by the evidence, to make the map amendment unassailable.[13]

Petitioner's case accordingly must turn on the third requirement: whether there is sufficient evidence supporting each finding—enough to convince reasonable minds of its adequacy.

### (3) *Sufficiency of the evidence*

 We cannot say on this record, despite the conflicts in the testimony, that the Commission's findings on the contested issues lack the required evidentiary support. More specifically, the reports by the Department of Environmental Services and the Municipal Planning Office provided sufficient support for the finding of "adequate city services." (Finding 5). As to the principal controversy, namely the impact of the proposed Safeway on traffic (Finding 6) as affected by other anticipated development along Wisconsin Avenue (Finding 4), the analysis is more complex. There were approximately 250 pages of testimony on the traffic issue by four witnesses—one for

Safeway, two from the Department of Transportation, and one for petitioner. During the six-month course of the hearings, Safeway's expert changed his testimony from an original estimate of "A" (optimum) level traffic to "D" (marginal) level, as the Department of Transportation (DOT) experts had testified. The DOT experts later receded from their testimony as to certain certain conditions the Safeway development had to meet to avoid an "E" level situation ("complete breakdown"); they did so in part because of ameliorating changes in other proposed development along Wisconsin Avenue (*e. g.,* the Holiday Inn project had been scaled down, including elimination of a proposed 600-seat theatre). Finally, the petitioner's expert, who had estimated an "E" level impact, was severely challenged on his credentials as an expert.

Under these circumstances, we cannot say that the Commission's Findings 4 and 6 with respect to other development projects and traffic impact—based on testimony by three of the four experts—were unsupported by substantial evidence. There is no way for a reviewing court, on such a record, to second-guess the Commission, which had personal experience with the experts in a complex area with conflicting estimates.

### C. *The Limits on Required Findings*

Although this court is not to substitute its judgment for that of the Commission,[14] petitioner asserts that the conflict in the testimony was sufficiently sharp that we should hold the Commission to a higher standard of elaboration than it achieved here. According to the petitioner's brief,

---

13. The "rational connection" requirement sometimes requires an agency not merely to demonstrate that the facts, taken together, rationally lead to the decision but also, as a prerequisite, to describe the agency's methodology that establishes *why* the facts rationally support the decision. In a public utility rate-making proceeding, for example, the rational connection of basic facts to a regulatory commission's order may not be self-evident to a reviewing court, under very general statutory criteria ("reasonable, just, and non-discriminatory" rates), without an intelligible explanation as to how the commission applies its expertise to the facts to arrive at its decision. *See gener-*

*ally Washington Pub. Interest Org. v. Public Serv. Comm'n, supra.* In the present case, however, no such problem is presented. Although evaluation of the evidence here requires some expertise, there need not be an explanation connecting the findings of basic fact to the conclusions of law and decision; the connection is easy to perceive.

14. *See Kenmore Joint Venture v. Board of Zoning Adjustment,* D.C.App., 391 A.2d 269, 276 (1978); *Communications Workers, supra* at 152; *Lewis v. District of Columbia,* 89 U.S.App. D.C. 72, 74, 190 F.2d 25, 27 (1951).

the "rationale of the Commission's finding [on traffic] was not set forth in the Decision." Petitioner argues that the challenged findings are too conclusional—that the Commission is obliged to explain more precisely than it did how it arrived at its basic findings on "each contested issue of fact." DCAPA § 1–1509(e). In effect, petitioner argues that there is a fourth requirement under the "substantial evidence" test: the agency must express the *reasons why* it found the basic facts as it did, explaining, for example, why it favored particular testimony.

While this argument has obvious appeal, calling for the ultimate in rational, elaborated decision-making, it cannot prevail in this case—as the history of the DCAPA makes clear. Because this petition necessitates our consideration, for the first time, of the limits on required elaboration of findings of fact in agency decision-making, it is important that this question receive thorough examination.

After a substantial effort for over a dozen years by the Bar Association of the District of Columbia and others interested in administrative reform, Congress adopted the DCAPA on October 21, 1968 (effective one year later), to assure a fair and more uniform administrative process for ninety-three or more local government agencies. Pub.L.No. 90–614, 82 Stat. 1203 (current version, codified at D.C.Code 1978 Supp., § 1–1501 *et seq.*); S.Rep.No. 1581, 90th Cong., 2d Sess. 1–2 (1968); *Woodridge Nursery School v. Jessup,* D.C.App., 269 A.2d 199, 200 (1970); *see generally* Griffin, *The District of Columbia Administrative Procedure Act: Its History, Provisions, and Interpretation,* 61 Geo.L.J. 575 (1973). The drafters intended to provide procedures comparable to the federal Administrative Procedure Act, but in the provisions of significance to this case they relied primarily on the original (1946) and revised (1961) Model State Administrative Procedure Acts adopted by the National Conference of Commissioners on Uniform State Laws. S.Rep.No. 1581, *supra* at 2; H.R.Rep.No. 202, 90th Cong., 1st Sess. 1, 4–5 (1967); Griffin, *supra* at 576–77.

Especially relevant here is § 11 of the 1946 Model Act from which the following language of DCAPA § 1–1509(e) is taken:

The findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact.

In the 1961 revision of the Model Act, the foregoing language was rewritten, in § 12, to read as follows:

Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings.

Several aspects of this Model Act development are noteworthy. First, both the 1946 and 1961 provisions were "designed to achieve the same end" and are not materially different in the fact-finding burdens imposed on the agency. 2 F. Cooper, State Administrative Law 470 (1965). Thus, the 1961 Act can be read to provide an interpretive gloss on the 1946 provision incorporated into § 1–1509(e). Second, the Model Acts—and then DCAPA § 1–1509(e)—were drafted to achieve the degree of explicitness in agency findings required by *Saginaw Broadcasting Co., supra,* in which our federal circuit court emphasized the importance of "basic" or "underlying" facts. *Id.* 68 App.D.C. at 287–89, 96 F.2d at 559–61; *see Woodridge Nursery School, supra* at 202; Model State Administrative Procedure Act (U.L.A) § 12, Comment (1961).[15] Finally, although the required findings under § 1–1509(e) ("conclusions upon each contested issue of fact") have been construed to be findings of "basic" or "underlying" facts, it is important to note that neither of the Model Acts nor their principal authority, *Saginaw Broadcasting Co., supra,* requires an additional statement of reasons to justify the basic findings. As the drafters have perceived it, the findings themselves, taken

---

**15.** As indicated earlier, our case law has interpreted DCAPA § 1–1509(e), drawn from the 1946 Model Act, to include a "basic" or "under-

lying" facts requirement, which is the approach taken in the 1961 Model Act.

together, provide a sufficient articulation of the reasons for decision.[16]

With this said, we also should note that in some respects the 1961 Model Act provides for a more detailed statement of agency reasoning than the 1946 version and the DCAPA require. For example, § 12 of the 1961 Act also provides that "[i]f, in accordance with agency rules, a party submitted proposed findings of fact, the decision shall include a ruling upon each proposed finding"—a powerful way of forcing an agency to come to grips with the parties' assertions. See 2 F. Cooper, *supra* at 478–81.[17]

In addition, for contested cases in which a majority of the agency officials who are to make the final decision have not personally heard the case (*e. g.,* cases using a hearing examiner), the DCAPA and the 1946 Model Act require that a proposed decision, "including findings of fact and conclusions of law," be served on the parties, with an opportunity for them to "file exceptions and present argument to a majority of the officials who are to render the order or decision." DCAPA § 1–1509(d); Model State Administrative Procedure Act (U.L.A) § 10 (1946). In lieu of proposed findings and conclusions, however, the 1961 Model Act provides that "[t]he proposal for decision shall contain a statement of the reasons therefor and of each issue of fact or law necessary to the proposed decision . . . .." Model State Administrative Procedure Act (U.L.A.) § 11 (1961). The drafters concluded that this would require a sharper focus by the decision-makers on the critical issues, resulting in a more meaningful hearing and final decision, than that provided by the 1946 Model Act. See 2 F. Cooper, *supra* at 462.

It is clear, therefore, that in some respects the 1961 Model Act has gone beyond the 1946 version—and the DCAPA—in requiring an articulation of reasons for findings. The point is, however, that the DCAPA, apropos of the original and revised Model Acts, imposes a "basic" or "underlying" facts requirement in § 1–1509(e)—*without more.*[18] Congress deemed the basic findings of fact themselves to provide enough reference points for a reviewing court to determine whether those facts each have sufficient evidentiary support and, when taken together, rationally lead to the agency's decision.

It follows that the Commission's Findings 5 and 6 as to the adequacy of city services available to an enlarged Safeway and the anticipated impact on the existing street

---

**16.** Interestingly, the Minnesota legislature explicitly provided that the findings of basic fact *are* the reasons; it expanded the 1946 version of the Model Act, § 11, to read as follows:

> Every decision and order adverse to a party . . . . shall be accompanied by a statement of the reasons therefor. The statement of reasons shall consist of a concise statement of the conclusions upon each contested *issue of fact necessary to the decision.* [Minn.Stat.Ann. § 15.0422 (West 1977).]

The Wisconsin legislature, too, apparently took care to make clear that state agencies were not required to articulate reasons in addition to their findings of basic fact. Wisconsin modified § 11 of the 1946 Model State Act to require "a concise and separate statement of the *ultimate* conclusions upon each material issue of fact." Wis.Stat.Ann. § 227.10 (West Supp. 1978) (emphasis added). While the actions of these other states, of course, do not reflect the intent of Congress in adopting the DCAPA, we believe that the Minnesota and Wisconsin clarifications underscore, rather than derogate from, the thrust of the 1946 Model Act provision incorporated in the DCAPA.

**17.** *Compare* the federal Administrative Procedure Act, 5 U.S.C. § 557 (1976), which entitles parties to submit proposed findings, conclusions, exceptions, and supporting reasons and further provides:

> The record shall show the ruling on each finding, conclusion, or exception presented. All decisions, including initial, recommended, and tentative decisions, are a part of the record and shall include a statement of—
> (A) findings and conclusions, *and the reasons or basis therefor,* on all the material issues of fact, law, or discretion presented on the record; and
> (B) the appropriate *rule,* order, sanction, relief, or denial thereof. [Emphasis added.]

**18.** In *Dietrich, supra* we concluded our discussion of the "basic" facts requirement of § 1–1509(e) as follows: "In short, as we have said before, there must be findings on each material fact with full reasons given to support each finding." *Id.* at 473. In context, the reference to "full reasons" meant that all essential basic facts must be supplied in support of the agency's finding on each material contested issue.

system, respectively, are the type of basic findings, *i. e,* "conclusions upon each contested issue of fact," called for by the DCAPA. As indicated earlier, each of these findings is supported by sufficient evidence to sustain the Commission's decision.

## IV. *Conclusion*

 In announcing this decision, we underscore the significance of our conclusion that the findings of basic facts—given their number, nature, and support in the record—rationally lead to the conclusions of law and Commission order in this case. If the findings did not deal with all the material issues, the result presumably would be different. *See Communications Workers v. Commission on Human Rights,* D.C.App., 367 A.2d 149, 153 (1976). What we narrowly decide here, therefore, is this: when the findings of basic facts are each supported by sufficient evidence and, when taken together, rationally lead to conclusions of law and an agency decision consistent with the governing statute, we shall affirm that decision. The agency is not legally required to explain, in addition, why it favored one witness or one statistic over another.[19]

If we were to require the Commission to sort out in writing, for example, how it came to accept the judgments of certain traffic experts and not others, the burden on the Commission would surely outweigh the incremental benefits of further enlightening the parties and facilitating judicial review. Given factors in this case such as the challenge to one expert's credentials, the revision of testimony by other experts, and the changing character of the other development projects in the area during the course of the proceeding, the Commission would have had to prepare pages and pages of elaborate justification, including subjective reactions, to contribute any insight of value beyond the obvious implication of the present findings: the experts testifying favorably for the map amendment, given their data and demeanor, were more persuasive.[20]

This is the first case in which this court has had to consider the furthest an agency must go under the DCAPA in detailing its reasons for decision. We are concerned in reaching the result here that it not chill efforts by agency decision-makers to engage in careful fact-finding. We trust we will not be understood to imply a relaxing of the substantial evidence test. This court shall continue to scrutinize very carefully whether the agency has made enough findings of basic facts on every material contested issue, *see, e. g., Communications Workers, supra; Smith, supra; Miller, su-*

19. It is conceivable, though not the case here, that the evidence in support of a finding could be so weak, in contrast with evidence to the contrary, that an agency—to avoid a remand—would have to give persuasive reasons for its reliance on particular testimony; otherwise, the evidence could not be deemed "reliable, probative, and substantial." DCAPA § 1–1509(e); *see. e. g., Communications Workers, supra* at 153; *Shay, supra* at 178 n.10.

In addition, as explained earlier, demonstration of the rational connection between findings of fact and an agency decision also may require a statement of the reasons for the methodology used. *See* note 13 *supra.*

20. Our decision in *Shay, supra* is not a contrary holding. In *Shay,* this court vacated an order denying an application for special exception and remanded it to the BZA because the "findings of fact [were] little more than recitals of undisputed facts of record and very brief references to the testimony in support and in opposition to the application," *id.* at 176, and "the Board's findings of fact [were] devoid of any

delineation of the factors weighed in reaching its conclusions of law." *Id.* at 178. In dicta, the court stated that the Board must "articulate with reasonable certainty the reasons for the disposition of each contested issue of fact," *id.* at 177, and that "some indication in the findings as to the reasons for rejecting the expert testimony in favor of that of lay witnesses was certainly required if judicial review is to be meaningful." *Id.* at 178 n.10.

To the extent that this dicta—or similar dicta in other cases—appears inconsistent with this opinion, we discard it. As indicated, however, in note 19 *supra,* there is a narrower reading for *Shay, supra.* It stands for the proposition (among others) that there may be certain basic findings of fact on contested issues which are so thinly supported by evidence of record that still other findings would be required to demonstrate that there is "reliable, probative, and substantial" evidence to support them. In this situation, some findings might conveniently be stated in terms of "reasons" supporting others.

pra; *Dietrich, supra;* whether the facts rationally lead to the conclusions of law and ultimate decision of the agency, *see, e. g., Jameson's Liquors, supra* at 418–20; *Smith, supra* at 359–60; and whether the facts are supported by sufficient evidence, *see, e. g., Group Hospitalization Inc. v. Commission on Human Rights,* D.C.App., 380 A.2d 170, 174 (1977); *Newsweek Magazine v. Commission on Human Rights,* D.C.App., 376 A.2d 777, 785 (1977), *cert: denied,* 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978). We shall not hesitate to vacate an order and remand for further proceeding when any of these requirements is not met.

For the reasons set forth above, the Commission's order adopting the C–1 zoning map amendment for Safeway's property on Wisconsin Avenue is affirmed.[21]

*Affirmed.*

## APPENDIX

### FINDINGS OF FACT

1. The applicants have requested a Zoning Map change from R–1–B to C–2–A for parts of Lots 318 and 1009 in Square 1299 located at 1855 Wisconsin Avenue, N.W.

2. The purpose of the map amendment is to provide for the replacement and expansion of the existing 27,123 square foot Safeway store located on the portion of the proposed site now zoned C–2–A. A new store of 44,460 square feet would be built at the rear of the proposed site in the area now zoned R–1–B. Parking for 212 cars would be provided in front of the new store. At present, 131 parking spaces are located at the rear of the existing store and 18 parking spaces are leased from the owners of the Page Building.

3. The subject property is located on the east side of Wisconsin Avenue and bordered to the north by the Page Building complex and a Dart Drug store, to the south by the Jelleff's Boy's Club recreational complex, and to the east by Dumbarton Oaks Park. Immediately across Wisconsin Avenue to the west of the subject property are located Gordon Junior High School and some strip commercial development which includes miscellaneous small shops and business facilities.

4. Other development projects expected in the area include the Russian Chancery at Mount Alto on Wisconsin Avenue, a new Holiday Inn on Wisconsin Avenue at Whitehaven Parkway, the French Chancery on Reservoir Road and additions to the Georgetown University Campus south of Reservoir Road.

**21.** Petitioner's other contentions deserve only brief mention. It is argued that the Commission failed to give "great weight" to the issues and concerns of the affected Advisory Neighborhood Commissions, as required by D.C. Code 1978 Supp., § 1–171(d) and explained in *Kopff, supra.* This contention lacks merit for the reasons elaborated in *Wheeler, supra* at 89–91.

In addition, we do not perceive unfairness or lack of due process as a result of allegedly improper participation in the proceedings by officials of the Metropolitan Planning Office and the Department of Transportation. On the other hand, although it is not a source of prejudice or a basis for reversal here, the participation of applicant's counsel as a witness before the Commission was not proper and should be avoided. *See Shay, supra* at 178 n.8.

Further, petitioner does not demonstrate how the applicant's submission of a slightly modified site plan after the close of the hearings—a plan which corresponded to the C–1 rezoning recommended by NCPC—could have prejudiced any of its rights or could cast doubt on the validity of the Commission's ultimate determination. There is no suggestion that petitioner was deprived of the opportunity to present any additional evidence or argument particularly relevant to acceptability of the modified site plan.

Finally, petitioner argues that Safeway's contemplated project cannot be accomplished in the manner consistent with C–1 zoning. *See* D.C. Zoning Regulations § 5101.1. We assume that any building on the site must comply with D.C.Code 1973, § 5–422, subject to review by the Board of Zoning Adjustment under § 5–420. The map amendment does not grant Safeway the right to build in a manner inconsistent with the zoning regulations. Accordingly, the Commission's rezoning action, contrary to the petitioner's contention, does not transgress such regulations.

5. There are adequate city services available to service the proposed redevelopment of the Safeway site.

6. Traffic anticipated to be generated by the new food store can be accommodated by the existing street system.

7. There is a need to retain and expand food marketing facilities to serve the daily needs of the community while at the same time protecting the stability and aesthetic quality of nearby residential areas.

8. If the existing C–2–A and R–1–B areas comprising the proposed Safeway site, with the exception of a small triangular area abutting the rear of the proposed building, are zoned C–1 the resulting permitted building envelope of 137,721 square feet of gross floor area would be adequate to meet the needs of the applicant. The Zoning Map Amendment providing C–2–A for the entire site, as proposed by the applicant, would result in a development potential of 274,000 square feet of gross floor area which is considerably greater than needed to provide for the replacement of the store as contemplated by the applicant.

9. Advisory Neighborhood Commission 3–A has taken the position that the public interest would not be served by approving the expansion of the existing store.

10. The National Capital Planning Commission reported that the Zoning Map Amendment would not have a negative impact on the interests of the Federal establishment as they relate to the Georgetown Historic District, a Category II Landmark of the National Capital listed in the National Register of Historic Places. The Commission further recommended that development be carried out in accordance with a specific site plan and set of building profiles.

## CONCLUSIONS OF LAW

1. The requested C–2–A zoning would provide excess development potential which if fully utilized could have an adverse impact on the surrounding residential neighborhood.

2. C–1 zoning of the entire site, except for a small portion at the rear adjacent to the park, would provide sufficient development potential for such a food marketing facility.

3. Development within the C–1 District limitations would not have an adverse impact on the surrounding residential neighborhood, the Federal interest and the Georgetown Historic District, and would be consistent with the existing commercial development along this section of Wisconsin Avenue.

4. This rezoning will promote orderly development in conformity with the entirety of the District of Columbia Zoning Plan as embodied in the Zoning Regulations and Map of the District of Columbia.

5. It is beyond the authority of the Zoning Commission to change the Zoning Map contingent upon an applicant satisfying certain conditions which the Zoning Commission might specify.

6. This action is in accordance with the Zoning Act (Act of June 20, 1938, 52 Stat. 797), by furthering the general public welfare and serving to stabilize and improve the area.