Lawrence A. MONACO, Jr., Petitioner,

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,**

**Frank R. Gailor and Paul London, Intervenors.**

**No. 79-177.**

District of Columbia Court of Appeals.

Argued Oct. 18, 1979.

Decided Dec. 10, 1979.

Rehearing En Banc Denied March 20, 1980.

by the court rather than the jury. These clerical errors must be corrected pursuant to Super. Ct.Cr.R. 36.

Lawrence A. Monaco, Jr., pro se.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, Louis P. Robbins, Principal Deputy Corp. Counsel at the time the brief was filed, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., entered an appearance for respondent and adopted the brief of intervenors.

Jacques B. DePuy, Washington, D. C., with whom John J. Delaney, Washington, D. C., was on the brief, for intervenors.

Before NEWMAN, Chief Judge, FERREN, Associate Judge, and KESSLER, Associate Judge of the Superior Court of the District of Columbia.*

FERREN, Associate Judge:

Petitioner challenges the Board of Zoning Adjustment's (BZA's) approval of a request for (1) a special exception to change a nonconforming use from a moving and storage warehouse to a squash court facility; (2) a variance permitting enlargement of the nonconforming structure by replacing the roof at a new height to accommodate the squash courts; and (3) a special exception to change an adjacent nonconforming use from a moving and storage warehouse to a parking garage for 10 cars. Petitioner contends that the BZA's findings of fact and conclusions of law as to all three requests were inadequate; that the BZA violated D.C.Code 1973, § 5–419, by granting a variance for enlargement of a nonconforming use; and that the BZA, in any event, applied an incorrect legal standard in granting the requested variance.[1] Finding no error, we affirm.

## I.

On July 5, 1978, Frank R. Gailor applied to the BZA for (1) a special exception under § 7104.2 of the zoning regulations[2] to change a nonconforming use from a moving and storage warehouse in the R–4 district at 214–16 D Street, S.E.,[3] to a squash court

---

* Sitting by designation pursuant to D.C.Code 1973, § 11–707(a).

1. Petitioner also urges reversal on the ground that the BZA improperly placed the burden of proof on the opponents of Gailor's application. Our review of the record (including the BZA's January 24, 1979 order) reveals no basis for this contention.

2. Section 7104.2 provides that the BZA may grant a special exception to change a Class II nonconforming use (i. e., any nonconforming use of a structure that is not deemed a nonconforming use of land) "to a use which is permitted in the most restrictive district in which the existing nonconforming use is permitted."

3. The building at 214–16 D Street, S.E., is a two-story structure of approximately 13,000 square feet. It was originally built in 1886 as a livery stable. According to Paul London (current lessee and an intervenor in this action), the building has been used continuously for com-

facility, and (2) a variance from the requirements of § 7107.1 of the zoning regulations,[4] in order to enlarge the same nonconforming structure by elevating the roof to accommodate two floors of interior squash courts. The BZA scheduled a public hearing for August 16, 1978. By letter of August 15, 1978, however, Gailor's counsel moved to postpone the hearing and requested permission to amend the application. The following day, the BZA gave Gailor permission to amend his application by adding a request for a second special exception under § 7104.2 to change part of the ground floor of an adjacent nonconforming use at 218–20 D Street, S.E.,[5] from a moving and storage warehouse to a 10-car parking garage for the exclusive use of patrons of the proposed squash court facility.[6]

The two buildings covered by the Gailor application are located within the Capitol Hill Historic District. They both are currently used as moving and storage warehouses operated by the D Street Moving and Storage Company. The area surrounding the proposed squash court site contains single-family residences, commercial buildings, restaurants, government buildings, parks, and schools. To the west of the site (separated by a 15-foot alley) is a PEPCO substation. An American Legion facility abuts the site on the east. Directly across the street is a park.

The BZA conducted a public hearing on Gailor's amended application on November 1, 1978. Those who endorsed the application (either in writing or at the hearing) included the District of Columbia Municipal Planning Office; Advisory Neighborhood Commission 6B; the Department of Health, Physical Education, Athletics and Safety of the District of Columbia Public Schools; and local property owners. The Capitol Hill Restoration Society did not take a position. Most of the opposition was voiced by local residents (joined by the developer of a potential competing squash facility) who expressed fears about traffic congestion and increased parking problems.

On January 24, 1979, the BZA issued its final order granting the application (by a 4–0 vote, with one member not voting), subject to conditions that (1) the squash facility's hours of operation would be from 6:30 a. m. to 11 p. m., and (2) the facility would close at 11 p. m. On February 9, 1979, Lawrence A. Monaco (a Capitol Hill resident who had opposed the application at the public hearing) filed a petition with this court for review of the BZA's final order. Thereafter, Frank R. Gailor (the original applicant and present owner of the two properties) and Paul London (the present lessee of both properties and the developer of the proposed squash court facility) intervened.

mercial purposes. At the BZA hearing, various witnesses described the building as being "in a state of disrepair," "in pretty bad shape," and "deteriorating." Gailor's original application proposed that this structure be converted to a squash court facility with 10 squash courts, a lounge and reception area, a pro shop, a babysitting facility, an exercise room, locker, shower and other accessory rooms, and a parking facility for five cars. Gailor also proposed exterior changes for the structure, including repair, cleaning, and painting of the facade; installation of new windows; and repavement of the sidewalk.

4. Section 7107.1 provides: "No structure devoted to a nonconforming use may be enlarged, nor may a new structure be erected to house a nonconforming use."

5. The building at 218–20 D Street, S.E., is a three-story building structure of approximately 13,500 square feet. It was built in 1892 and

has been used for commercial purposes ever since.

6. This amendment was a response to community concerns that the originally planned off-street parking, consisting of five parking spaces, was inadequate to accommodate the patrons of the proposed squash courts. Advisory Neighborhood Commission 6B passed a resolution concerning the proposed facility on the same date Gailor sought to amend his application. The resolution supported the application for a special exception and variance, "provided that a total of fifteen off-street parking spaces are provided." The resolution added: "Many residents are concerned about the impact of a squash facility on parking conditions in the area. The original application allowed for 5 parking spaces, but an amendment adding 10 spaces would seem to ease the fears of many concerned residents."

## II.

Petitioner contends, first, that the BZA order is based on inadequate findings of fact and conclusions of law. Specifically, he contests[7] the BZA's findings with respect to (1) the increased amount of motor vehicle and pedestrian traffic that would be generated by a squash court facility (findings 12, 13, 20, 25–29); (2) the increased amount of noise such a facility would generate (findings 27 and 30); and (3) the adaptability of the present nonconforming structure for conversion to a conforming, i. e., residential, use (finding 31).

In *Citizens Association of Georgetown, Inc. v. District of Columbia Zoning Commission*, D.C.App., 402 A.2d 36 (1979) (*Georgetown Citizens*), we summarized an administrative agency's responsibilities, and our corresponding review function, under the "substantial evidence" requirement of the District of Columbia Administrative Procedure Act (DCAPA), D.C.Code 1978 Supp., § 1–1509(e):[8]

> [T]he DCAPA "substantial evidence" test requires (1) the agency to make written findings of "basic facts" on all material contested issues; (2) these findings, taken together, must rationally lead to conclusions of law ("ultimate facts") which, under the governing statute, are legally suf-

ficient to support the agency's decision; and (3) each basic finding must be supported by evidence sufficient to convince reasonable minds of its adequacy. [*Georgetown Citizens, supra* at 42.]

We hold that the BZA's findings and conclusions—and resulting decision—meet these requirements. As indicated, there are findings on each material contested issue of fact. Moreover, the conclusions of law flow rationally from these findings and are sufficient to support the decision.[9] Finally, each finding is supported by ample evidence.

Petitioner's principal concern appears to be not so much that the intervenors' evidence is inadequate to support the BZA findings and conclusions but that the BZA did not expressly deal with the opposition testimony. This argument, however, is unavailing:

> [W]hen the findings of basic facts [on all material contested issues] are each supported by sufficient evidence and, when taken together, rationally lead to conclusions of law and an agency decision consistent with the governing statute, we shall affirm that decision. *The agency is not legally required to explain, in addition, why it favored one witness or one statistic over another.* [*Georgetown Citizens, supra* at 47 (emphasis added).][10]

7. "On appeal, . . . we deal only with issues of fact which are still contested; we thus assume the validity of findings and conclusions unquestioned by the petitioner." *Citizens Ass'n of Georgetown, Inc. v. D. C. Zoning Comm'n*, D.C.App., 402 A.2d 36, 43 n.10 (1979).

8. D.C.Code 1978 Supp., § 1–1509(e) provides in part:

> Every decision and order adverse to a party to the case, rendered by the Mayor or an agency in a contested case, shall be in writing and shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact. Findings of fact and conclusions of law shall be supported by and in accordance with the reliable, probative, and substantial evidence.

*Georgetown Citizens, supra*, interprets this "substantial evidence" test. *See id.* at 41–48.

9. The BZA conclusions of law include the following: "that no noise or other adverse conditions will emanate from the proposed squash

facility, that the fifteen parking spaces provided in the two buildings will more than adequately accommodate off-street parking needs, that there are no traffic or other impacts which will be to the detriment of nearby or other property owners, that the particular buildings involved are well-suited for their proposed uses and that the squash court building is not readily adaptable for residential uses."

10. Petitioner filed his opening brief before our decision in *Georgetown Citizens, supra*. In his reply brief and at oral argument, he stressed that, absent BZA analysis of the opposition testimony, the rational connection between its findings and decision is not evident. *See Georgetown Citizens, supra* at 44 n.13, 47 n.19. He also argued that the evidence in support of the BZA's findings is "so weak, in contrast with evidence to the contrary," *id.* at 47 n.19, that the failure to give persuasive reasons for accepting the proponent's testimony while rejecting the opposition warrants a remand. Neither contention has merit on this record.

### III.

Petitioner agrees that if the BZA's findings and conclusions are supported by reliable, probative, and substantial evidence, the two special exceptions permitting the nonconforming squash court facility and parking lot in the R–4 district are valid. Thus, in view of our conclusion in *Part* II *supra*, the only issues remaining concern the BZA's grant of the variance permitting an increase in the height of the building to accommodate construction of squash courts.

■ A. Petitioner contends that D.C. Code 1973, § 5–419, imposes an absolute prohibition against increasing the height of the roof because the statute forbids the "enlargement" of a nonconforming use.[11] He is not correct, for this argument ignores D.C.Code 1973, § 5–420(3), which provides in part:

> Where, by reason of exceptional narrowness, shallowness, or shape of a specific piece of property . . . or by reason of exceptional topographical conditions or other extraordinary or exceptional situation or condition of a specific piece of property, the strict application of any regulation adopted under sections 5–413 to 5–428 would result in peculiar and exceptional practical difficulties to or exceptional and undue hardship upon the owner of such property, . . . [the

BZA may grant] a variance from such strict application so as to relieve such difficulties or hardship, provided such relief can be granted without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the zone plan as embodied in the zoning regulations and map.[12]

We find authority here for the BZA to grant a variance altering a nonconforming use, including creation of an "enlargement," if the other applicable criteria are met. *Cf. Hot Shoppes, Inc. v. Clouser*, 231 F.Supp. 825 (D.D.C.1964), *aff'd*, 120 U.S. App.D.C. 353, 346 F.2d 834 (1965) (where health department required restaurant with nonconforming drive-in service to store commissary carts undercover—which may have suggested, but did not require, use and "structural alteration" of a partially enclosed, roofless structure adjacent to the main building—the BZA could grant a variance under § 5–420 if the statutory criteria were met).[13]

The legislative history of §§ 5–419 and –420 reveals that the bill initially authorized termination of nonconforming uses.[14] This provision was amended, resulting in the language presently incorporated in § 5–419,[15] in response to protests that such terminations would bring about considerable hardship.[16] Given that particular con-

---

11. D.C.Code 1973, § 5–419, provides in part: [Nonconforming uses] may be continued . . . , provided no structural alteration, except such as may be required by law or regulation, or no enlargement is made or no new building is erected. The Zoning Commission may in its discretion provide, upon such terms and conditions as may be set forth in the regulations, for the extension of any such nonconforming use throughout the building and for the substitution of nonconforming uses.

12. D.C.Code 1973, § 5–420(3) is implemented by § 8207.11 of the zoning regulations, which contains substantially similar language sufficient to modify the prohibition of enlargements in regulation § 7107.1. *See* note 4 *supra*.

13. Because we conclude that § 5–420 empowers the BZA to grant a variance, we need not consider intervenors' argument that § 5–419 only precludes enlargement of the existing warehouse, as such, and that the last sentence

of § 5–419, permitting "the substitution of nonconforming uses," is broad enough to authorize a variance for increasing the height of the roof on a new, "substituted" squash court facility created by special exception.

14. The originally proposed bill (H.R.9844) included a section that went "further than existing law and authorize[d] the [Zoning] Commission, subject to certain limitations, to provide for the termination of nonconforming uses." H.R.Rep.No. 2418, 75th Cong., 3d Sess. 2 (1938).

15. *Compare* 83 Cong.Rec. 8330 (1938) *with* note 11 *supra*.

16. *See Zoning of the District of Columbia, Hearings on S.3361 Before a Subcomm. of the Comm. on the District of Columbia*, 75th Cong., 3d Sess. (1938).

cern, we find no indication that Congress, in generally barring enlargement of nonconforming uses (while declining to permit terminations), intended to freeze the status quo to the point of permitting no deviation whatsoever from that prohibition. This case is an especially good illustration of why an absolute bar to a variance would be counterproductive. By granting special exceptions, coupled with a variance, to create a squash court facility out of a commercial warehouse, the BZA has facilitated creation of a more restrictive (though still nonconforming) use. Given authority for these special exceptions, we find authority in § 5–420(3), addressed to "exceptional situation[s]," for the variance necessary to achieve this result.

■ B. Petitioner contends, next, that the BZA erred in applying the "practical difficulties" standard to Gailor's request for a variance, since that standard applies to an area variance and, in petitioner's view, the application here is for a use variance requiring a showing of "exceptional and undue hardship." Alternatively, petitioner contends that Gailor failed to meet the "practical difficulties" showing necessary for an area variance.

This court has held that D.C.Code 1973, § 5–420, and the corresponding provision of the zoning regulations, § 8207.11, establish dual "statutory requisites to the granting of variances—i. e., a showing of 'practical difficulties' [for area variances] or 'undue hardship' [for use variances]." *Wolf v. District of Columbia Board of Zoning Adjustment*, D.C.App., 397 A.2d 936, 941 (1979) (quoting *Palmer v. Board of Zoning Adjustment*, D.C.App., 287 A.2d 535, 540 (1972)).[17] Because it is not always easy to determine whether an application is for an area or a use variance, we have reviewed classifications of proposed variances with considerable deference to the BZA's expert judgment. *Wolf, supra* at 942 (and cases cited).

In the present case, the change of use from warehouse to squash courts occurs by virtue of a special exception. Thus, the variance sought is solely to increase the height of a roof. We cannot say that the BZA improperly characterized this change as an area variance simply because it facilitated a change of use accomplished, fundamentally, by special exception. *See Wolf, supra* at 941–42.

■ C. We turn, finally, to petitioner's alternative argument that Gailor's application fails to meet even the "practical difficulties" standard necessary for an area variance. While we have said that in order to show "practical difficulties" an applicant must demonstrate that "compliance with the area restriction would be unnecessarily burdensome," *Palmer, supra* at 542 (footnote omitted), we have added that "[t]he nature and extent of the burden which will warrant an area variance is best left to the facts and circumstances of each particular case." *Id.; accord, De Azcarate v. District of Columbia Board of Zoning Adjustment*, D.C.App., 388 A.2d 1233, 1237 (1978). In the present case, the BZA found that Gailor had shown "practical difficulties" by demonstrating that "the building is not readily adaptable to residential use." Finding 31; *accord*, finding 18 (building is not "structurally or economically" suitable for residential use; "building occupying 100 per cent of the squash site, constitutes a practical difficulty to the owner").[18] After reviewing the

17. In *Palmer, supra*, we defined the difference between area and use variances in general terms:

[A]n area variance, relating to such restrictions such as side yard, rear yard, frontage, setback or minimum lot requirements, does not alter the character of the zoned district, whereas a use variance seeks a use ordinarily prohibited in the particular district. [*Id.* at 541 (footnote omitted).]

18. Petitioner relies on cases in which we have said that no area variance can be granted where "properly conforming to the regulations will produce a reasonable income, but if put to another use, will yield a greater return." *Palmer, supra* at 542 (footnote omitted). *Accord, Capitol Hill Restoration Soc'y v. D.C. Board of Zoning Adjustment*, D.C.App., 398 A.2d 13, 16 & n. (1979). *Palmer* is inapplicable because it concerned an application for variance of a conforming use. In *Capitol Hill*, the BZA improperly granted a variance based on the owner's economic circumstances rather than characteristics of the property itself. In the present case the BZA concluded that a residential (i. e., conforming) use would not be economically feasible.

record, we conclude that the BZA's findings as to "practical difficulties" were "neither arbitrary nor capricious" and therefore must be sustained. *Wolf, supra* at 943; *Taylor v. District of Columbia Board of Zoning Adjustment,* D.C.App., 308 A.2d 230, 236 (1973).

*Affirmed.*