**DUPONT CIRCLE CITIZENS ASSOCIATION, Petitioner,**

**v.**

**DISTRICT OF COLUMBIA ZONING COMMISSION, Respondent.**

**International Association of Machinists and Aerospace Workers, Intervenor.**

**No. 80-80.**

District of Columbia Court of Appeals.

Argued Oct. 30, 1980.

Decided May 21, 1981.

Frederic R. Kellogg, Washington, D. C., for petitioner.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., for respondent. Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., at the time the briefs were filed, also entered an appearance on behalf of respondent and adopted the brief of intervenor.

Louis P. Robbins, Washington, D. C., with whom Norman M. Glasgow, Washington, D. C., was on the brief for intervenor.

Before NEWMAN, Chief Judge, and MACK and FERREN, Associate Judges.

NEWMAN, Chief Judge:

Petitioner, the Dupont Circle Citizens Association, seeks review of a Zoning Commission order approving an application by the International Association of Machinists (IAM) for construction of a Planned Unit Development (PUD) near Dupont Circle. Petitioner contends that IAM did not comply with the Commission's requirements for application materials, that the PUD requirements were not satisfied, and that the Commission failed to address the issues raised by petitioner. Finding no error, we affirm the Commission's order.

## I

On September 1, 1978, IAM applied for approval of a PUD under § 7501.6 of the Zoning Regulations.[1] The plans called for a ten-story office and retail building between Connecticut Avenue and 19th Street, N. W., less than a block from Dupont Circle. The property, which is zoned C–3–B, is currently used as a parking lot. The applicable zoning regulations permit a building height of ninety feet and a floor-to-area ratio (FAR) of 6.5 as a matter of right. *Id.* §§ 5201.1, 5301.1. The PUD procedure permits additional height and density (up to 130 feet and 7 FAR) in exchange for other "amenities" that will promote flexibility of development. *Id.* §§ 5201.1, 5301.1, 7501.1, 7501.-41, 7501.43. IAM sought permission for a building height of 118 feet (plus another 18.5 feet of rooftop structures such as a penthouse), and a density of 7 FAR.[2] In exchange for this extra height and density, IAM planned to raise the building up off the ground and develop a two-level pedestrian arcade passing from Connecticut Avenue to 19th Street, with a "mini-park," landscaping, and retail shops.

The Commission held four public hearings on the IAM application, on January 29, April 30, June 4, and August 6, 1979. The Commission did not address the merits of the project at the first hearing, however, because the application materials submitted by IAM were incomplete.[3] Instead, the Commission adjourned the hearing until April 30 and directed IAM to submit a complete application by March 6.

At the April 30 hearing, petitioner argued that IAM's application materials remained incomplete. Petitioner objected most emphatically to the written summaries of expert testimony required by § 2.414 of

1. Unless otherwise indicated, all references to the Zoning Regulations herein are to the regulations as they existed before February 8, 1979, which was the effective date of numerous revisions to the PUD regulations. Since IAM's application was filed before this date, the amended regulations are not applicable to this case. Zoning Regulations, § 7501.91 (as amended Feb. 8, 1979).

2. The two buildings adjacent to the property are the IAM building (also owned by the applicant), which is 110 feet high, and the Dupont Circle building, which is 130 feet high, with a density of 11.4 FAR. The density of 7 FAR sought by IAM is based on a calculation of the entire PUD site, which includes the existing IAM building.

3. For example, the application did not include water, drainage, landscaping, or erosion control plans. *See* Zoning Regulations, § 7501.61.

the Commission's Rules of Practice and Procedure. IAM's "written summaries" consisted of six brief outlines; most were only a few lines long, and one contained just a single phrase. The Commission ruled, however, that the material in the record was at least adequate to begin the hearing, and that any deficiencies could be corrected by later supplementation or by continuance of the hearing.

Before testimony began, the Commission discovered that it had received two different sets of documents from IAM, each set containing different appendices. The first witness, IAM's architect, began the testimony, but neither the Commissioners nor the witness could determine which set of figures and calculations was correct. The hearing was therefore recessed again until June 4.

By the time of the June 4 hearing, IAM had filed a slightly expanded set of expert testimony summaries, but, with one or two exceptions, each was still less than one-half page long. Petitioner renewed its objection to the inadequacy of the outlines. But the Commission's Executive Director stated that IAM's submission was consistent with those usually received in PUD cases, and that in his judgment the summaries did comply with Commission rules: "[T]he rules do not call for necessarily the verbatim testimony of all persons intending to be presented . . . ." On the basis of this statement the Commission Chair ruled that IAM's expert testimony outlines were sufficient.

IAM's architect then resumed his testimony. He was cross-examined by petitioner's representative. IAM also presented testimony from a planning consultant and a union official, both of whom were cross-examined by petitioner. IAM's last witness was the project developer and lessee.[4]

The final session of the Commission hearings took place on August 6, 1979. IAM's architect resumed the stand, in order to explain some minor changes in the plans that had been made in response to Commission suggestions at the prior hearing. In particular, the columns in the pedestrian mall and underground parking areas had been rearranged. The question of whether and where to add a Connecticut Avenue entrance to the lower level shops was left unresolved, because it would require merely a simple, nonstructural change, and a retail tenant might have a decided preference as to the design and exact location. The Commission agreed to provide "guidelines" on this feature, but to otherwise accept the design, even though this detail was not final.

Reports were then presented from various government agencies, including the Office of Planning and Development (OPD), the Fire Department, and the Department of Transportation, none of which opposed the development. Petitioner did not cross-examine the agency representatives.

Petitioner was the only party appearing in opposition to the development.[5] A representative submitted a written statement from the group and made a brief presentation. She argued first that the new building would "overload" the block in terms of height and density because of the excessive size of the adjoining buildings, and would thus "destabilize" the area. Second, she argued that the park and arcade would not really function as public amenities because they would be too small and difficult to get to. The net contribution of these amenities to the area, she claimed, would be unneces-

4. IAM also introduced four and one-half pages of written testimony from a transportation and traffic consultant, and a letter from a local real estate speculator supporting the project.

5. The Advisory Neighborhood Commission, ANC 2B, had appeared and submitted its written support of the project.

sary and quite trivial. Petitioner's written submission reiterated these arguments.

After the hearing was concluded, the Commission invited the parties to submit proposed findings and conclusions by September 6. IAM submitted a proposed order; petitioner did not. OPD submitted its report and recommendation September 7. On September 13, the Commission approved the project, subject to fifteen conditions drawn from the OPD report. On October 11, following approval by the National Capital Planning Commission (NCPC),[6] the Zoning Commission issued its final order, containing twenty-one findings of fact, five conclusions of law, and the list of fifteen conditions on the project.

On October 25, petitioner sought reconsideration, alleging deficiencies in the findings of fact and Commission favoritism towards IAM. The Commission denied the motion on January 10, 1980. Petitioner then sought review in this court.

## II

### A. *Application and Prehearing Submission Requirements*

#### 1. *Finality of the Plans*

Section 7501.39 of the Zoning Regulations requires that PUD applications be "final" and include, *inter alia*, the following information:

* * * * * *

> g. The location of existing or *proposed* public and private rights-of-way and easements bounding and traversing the project area, and *indications* as to which of the rights-of-way or easements are to be continued, relocated or abandoned.
>
> h. The location and *approximate* number, size, and type of stores, offices, residential units and commercial adjuncts. [Emphasis added.]

Petitioner argues that, because requirements (g) and (h) above were not met, the application was never final at any stage of the hearing process.

At the third hearing, one Commissioner did express concern about the apparent lack of finality in the plans:

> [W]e don't have enough really developed to really see how it is going to do all the things it's supposed to do.
>
> . . . . .
>
> [T]his design presentation is woefully deficient right now. We just don't have the information [concerning the building facades, pedestrian park, and internal mall].

The developer conceded, "We are at too early a stage." But IAM then presented revised plans at the final hearing. Although the architect repeatedly denied that the plans were final,[7] the Commissioners were satisfied that the earlier ambiguities in the plan had been resolved. They agreed to leave one aspect of the design flexible (the entrance to the lower level from Connecticut Avenue, within the constraints of Commission "guidelines." [8]

6. Although the NCPC's Joint Committee on Landmarks recommended an unfavorable report on the project, as being "incompatible with" and "detrimental to" the Dupont Circle area, the NCPC ultimately reported back to the Commission that the project "would not have an adverse impact."

7. The architect stated:

> This is not an effort to show you a final design of the mall; however, it does show the concept.
>
> . . . . .
>
> Now, the store front design may change . . . .
>
> . . . . .
>
> We hope that you, in our order, will recognize that and not force us, or marry us, to what you are looking at on Sheets 18 and 19.

8. In its final order, the Commission included a general requirement that IAM develop the

We conclude that the finality requirement of § 7501.39 was satisfied here. The language of the Zoning Regulations contemplates that a certain amount of flexibility is necessary in a complex development such as this. For example, words like "indications" and "approximate" in paragraphs (g) and (h) of § 7501.39 acknowledge that it would be unrealistic to require applicants to provide exact details regarding certain aspects of a proposed project. More important, the Commission itself squarely determined that the application was sufficiently final to comply with the Regulations. We accord great deference to an agency's interpretation of its own administrative regulations, and we will uphold that construction unless clearly erroneous or inconsistent with the regulations. *Sheridan-Kalorama Neighborhood Council v. District of Columbia Board of Zoning Adjustment*, D.C.App., 411 A.2d 959, 961 (1979); *Barber v. District of Columbia Department of Human Resources*, D.C.App., 361 A.2d 194, 198 (1976); *see Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). We find no such error or inconsistency here.[9]

2. *Summaries of Expert Witness Testimony*

Petitioner objected repeatedly to the inadequacy of IAM's "written summaries" of expert testimony, required by the Commission's Rules of Practice and Procedure, 20 DCRR § 2.414.[10] Petitioner claims that the sparse outlines prepared by IAM denied petitioner fair notice of the issues and an opportunity to prepare for cross-examination.

The outlines were indeed brief, and hardly specific. Nevertheless, after considering petitioner's objection, the Commission explicitly concluded that the summaries complied with its rules. As we hold above, the agency's construction of its own regulations is entitled to considerable respect. *Sheridan-Kalorama, supra* at 961; *Barber, supra* at 198; *see Ford Motor Credit Co., supra* 444 U.S. at 566, 100 S.Ct. at 797; *Udall v. Tallman, supra* 380 U.S. at 16–17, 85 S.Ct. at 801; *Bowles, supra* at 413–14, 65 S.Ct. at 1217. Moreover, the agency's judgment here is entitled to additional deference because it was interpreting its own internal rule of procedure rather than the Zoning Regulations. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524–25, 543–45, 98 S.Ct. 1197, 1202, 1211–12, 55 L.Ed.2d 460 (1978); *Federal Power Commission v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 333, 96 S.Ct. 579, 583, 46 L.Ed.2d 533 (1976); *Federal Communications Commission v. Schreiber*, 381 U.S. 279, 289–91, 85 S.Ct. 1459, 1467–68, 14 L.Ed.2d 383 (1965); *Federal Communications Commission v. Pottsville Broadcasting Co.*, 309 U.S. 134, 143 & n.6, 60 S.Ct. 437, 441 & n.6, 84 L.Ed. 656 (1940). Finally, there is no indication in the record that petitioner was actually prej-

project "in accordance with" the plans submitted at the August 6 hearing, "except as such plans may be modified to conform to the standards listed below." Subsequent conditions in the order bind IAM to specific portions of these plans. The order also requires IAM to follow a revised first floor plan, submitted August 27, showing approximate locations of stairs and escalators going both up and down from the street level. The blueprint itself specifically reserves the option to change the location of the Connecticut Avenue stair, "subject to the requirements of tenant or tenants unknown at this time."

9. Petitioner also argues that the finality requirement was violated because the Commission began its hearings before the application was completely submitted in its final form. This procedure did not prejudice the petitioner, however, for petitioner had an opportunity to cross-examine the witnesses after the application materials were complete.

10. The Zoning Commission subsequently amended its Rules of Practice and Procedure in October 1979. This particular rule is now found at 20 DCRR § 3.2(a)(4).

udiced or hampered in its cross-examination by the abbreviated nature of the outlines. For example, although petitioner received only a three-quarter-page outline of the architect's testimony, petitioner's representative cross-examined him extensively, and she stopped her questioning only because the Commission insisted that she do so. In addition, several of the major witnesses were present at more than one hearing session, thus giving petitioner further opportunity to study their testimony for purposes of preparing cross-examination.

B. *Effect of the PUD Regulations*

We turn to petitioner's argument that this development does not comply with the PUD regulations. Petitioner contends that the developer must demonstrate, and the Zoning Commission must find, that every element of § 7501.1 of the Zoning Regulations [11] has been satisfied. The Commission's findings, it claims, do not respond to each of these factors, such as the requirement that the PUD project provide amenities superior to those available under traditional zoning. Petitioner argues, in effect, that § 7501.1 itself creates a contested issue that must be resolved with findings of fact. This court has recently rejected such an interpretation of § 7501.1 in *Dupont Circle Citizens Association v. District of Columbia Zoning Commission (American Trucking Associations and Sophia Menatos, Intervenors)*, D.C.App., 426 A.2d 327 (1981) [hereinafter cited as *American Trucking*]. In *American Trucking*, we held that § 7501.1 operates merely as a statement of purpose or preamble to the PUD regulatory scheme, *id.* at 332; it is "an expected result of the Commission's resolution of legally relevant issues," *id.* at 333, but not itself one of those issues. Thus, the Commission is not required to make specific findings addressing the elements of § 7501.1. *Id.* at 334.

This court's holding in *American Trucking* is limited to the first two paragraphs of § 7501.1, because the third paragraph applies by its terms only when height and density incentives have been granted, and the court found that no such incentives had been granted in *American Trucking*. Here, by contrast, the Commission *has* granted height and density incentives. Accordingly, the third paragraph is in issue here, and we must determine whether the reasoning of *American Trucking* extends to this provision. We hold that it does.

There is no basis for distinguishing the third paragraph of § 7501.1 from the first two. It cannot be doubted that the Commission intended these three paragraphs, as

11. Section 7501.1, as in effect at the time of IAM's application, reads as follows:

> 7501.1 PURPOSES OF PLANNED UNIT DEVELOPMENT—The purpose of this section is to encourage, in the various zoning *districts* in keeping with the intent and purpose of each district, the development of well-planned residential, institutional and commercial developments, industrial parks, urban renewal projects or a combination thereof, which will offer a variety of building types with more attractive and efficient overall planning and design without sacrificing creative and imaginative planning.
>
> The procedures and standards established herein are intended to permit, with Zoning Commission approval, diversification in the use, size, type and location of *buildings* and *structures*, and to improve circulation and site facilities while at the same time insuring adequate standards relating to public health, safety, welfare and convenience in the use and occupancy of *buildings, structures*, and other facilities, in planned *building* groups consistent with the spirit, intent and purpose of the Zoning Regulations.
>
> While providing for flexibility in design, a *planned unit development* should not be used to circumvent the intent and purpose of the general provisions of the Zoning Regulations. Increases in *building height* and density are permitted as an incentive to allow flexibility of development; however, such increases should not be granted when (a) [they] conflict with the development plans and policies of the District of Columbia; (b) they do not enhance the neighborhood; or (c) they do not provide future occupants of *planned unit developments* with a living and/or working environment and amenities superior to those which can be achieved by applying the general provisions of the Zoning Regulations. [Emphasis in original.]

a whole, to form a general statement of purpose. The *American Trucking* opinion implicitly recognizes this by repeatedly characterizing all of § 7501.1 as a preamble. *See id.* at 332–33. The three paragraphs are all contained within a single subsection of the regulations, under the title "Purposes of Planned Unit Development." *See* note 11 *supra.* And despite the enumeration within the third paragraph, all three paragraphs are cast in broad, general terms.[12] Finally, it is the third paragraph that contains the "superior amenities" clause, requiring that the development provide "a living or working environment and amenities superior to those which can be achieved [pursuant to traditional zoning procedures]." As this court recognized in *American Trucking*, it would be highly impractical to require specific findings as to the comparative superiority of the PUD project: "As a practical matter, speculating as to the type of facilities which 'might' be available under traditional regulation is, in itself, a potentially endless task limited only by the imagination. . . . [S]uch a comparison is almost impossible during the actual hearings." *Id.* at 332.[13]

Since we hold that the rationale of *American Trucking* extends to the third paragraph of § 7501.1, the proper role of this court upon review is restricted to examining whether the Commission's overall conclusion is "supported by *subsidiary* findings of basic facts" on material contested issues. *Id.* at 334 (quoting *Dietrich v. District of Columbia Board of Zoning Adjustment*, D.C.App., 293 A.2d 470, 473 (1972) (emphasis added).[14] The Commission must address

12. On February 8, 1979, after the first public hearing on IAM's proposal, the Zoning Commission revised the PUD regulations. The third paragraph of § 7501.1, *see* note 11 *supra*, was renumbered as § 7501.13 and amended to read as follows:

> 7501.13 In approving developments under the PUD process as herein specified, the Zoning Commission has the option to approve incentives, including increases in building heights and densities, to promote flexibility of development. *In approving such increases, the Zoning Commission shall consider whether* the application:
>
> A. *Conflicts with the development* plans and policies of the District of Columbia;
>
> B. Enhances the neighborhood;
>
> C. Provides present and/or future occupants of planned unit developments with a living or working environment and amenities superior to those which can be achieved by applying the other provisions of the Zoning Regulations. [Emphasis added.]

Though the amended provision does not apply to this proposal, *see* note 1 *supra*, the effect of the revision is to emphasize that this section embodies a set of general guidelines rather than specific contested issues of fact. The Commission is merely required to "consider whether" these goals are furthered. *Compare* note 11 *supra.* In our view, this amendment clarifies the prior intent of the Zoning Commission, rather than indicating that the Commission has somehow changed its policy. *Cf. United States v. Tapert*, 625 F.2d 111, 120–21 (6th Cir. 1980) ("An amendment to an existing statute is not an acknowledgement by Congress that the original statute is invalid. It is a common and customary legislative procedure to enact amendments strengthening and clarifying existing laws."); *accord, Fahey v. City Council of Sunnyvale*, 208 Cal.App.2d 667, 676, 25 Cal.Rptr. 314, 319 (1962). *See generally* 2A C. D. Sands, Statutes and Statutory Construction § 48.18 (4th ed. 1973). The intent of the Zoning Commission, as thus reflected in this revision of the regulations, provides further support for our conclusion that this section functions as a preamble or statement of purpose.

13. Petitioner is correct in pointing out that the comparative language in paragraph three is found nowhere else in the regulations. But this fact alone does not convert a general statement of purpose into a contested factual issue. For it is the function of the preamble here to summarize and synthesize the criteria that are set out in detail throughout the PUD regulations. As *American Trucking* explained, the preamble represents the end product or goal of the Commission's decision, not one of the steps leading up to it. 426 A.2d at 333.

14. *See generally Johnson v. United States*, D.C. App., 398 A.2d 354, 366 n.9 (1978) ("[I]n order not to substitute its judgment for the agency's the court utilizes a highly structured mode of review that determines whether the agency's result is within its range of permissible alternatives and tests the solidity of the foundation from which the agency draws that decision.")

those specific issues that are contested by the parties. *American Trucking, supra* at 334. This does not mean, however, that protestants in Zoning Commission proceedings may automatically elevate the general guidelines of § 7501.1 into material contested issues. For example, petitioner could not create a contested issue as to whether the "amenities" to be provided by this project are "superior" to those possible under another hypothetical project, even if petitioner attempted to present evidence in support of such a proposition. *See id.* at 333; *Lee v. District of Columbia Zoning Commission,* D.C.App., 411 A.2d 635, 638 (1980).[15]

C. *The Commission's Findings*

Petitioner argued before the Commission that (1) the new building would be too high and bulky in relation to the adjacent buildings, thus overloading and destabilizing the block, and (2) that the park and arcade would not function as public amenities because they would be too small and difficult to get to. Both of these arguments raise specific contested factual issues. After examining the record, we conclude that the Commission did address these issues in its findings of fact, which in turn are supported by substantial evidence.

The Commission's primary justification for the increase in height and density was that it would encourage development of "significant usable public pedestrian amenities" on the street level. (Findings 3–4.) The Commission found further that these "amenities" would be "consistent with public policy for the treatment of 19th Street." (Finding 14.)[16] These findings are supported by testimony from the architect, the planning consultant, and the OPD.

With respect to height, the Commission specifically found that the proposed height of the new building (118 feet) would be "in harmony, both architecturally and in height and bulk with the surrounding neighborhood," (Finding 8), and "completely in keeping with the scale of the adjacent buildings," (Finding 13), which are 110 feet and 130 feet, respectively. These findings are likewise supported by testimony from the architect, the planning consultant, and the OPD.

With respect to density, the Commission found that "the 7.0 FAR is suitable for the site." (Finding 20.) Petitioner contends that this is an unreasoned, "blunt answer" that tosses aside petitioner's argument without fair consideration. We disagree. The Commission did acknowledge and fairly summarize petitioner's argument that the FAR limit in the entire block would be exceeded. But it concluded that this objection was "not well founded." We cannot say that this finding is without substantial evidence, for it is supported *inter alia* by the testimony of the architect and the planning consultant.

The Commission also addressed and summarized petitioner's argument that "the proposed urban park cannot properly function as an amenity[,] as access thereto is

15. Though the considerations listed in § 7501.1 cannot themselves become contested issues, this section nonetheless serves as the legal standard by which the Commission's conclusions of law must be guided; it represents "an expected result of the Commission's resolution of legally relevant issues." *American Trucking, supra* at 333.

16. In making this finding, the Commission relied upon an unofficial study and proposal for enhancing pedestrian areas in the city center. This study was used as a basis for implementing a consistent policy on "streetscaping." Petitioner contends that reliance on such a study was impermissible, but advances no reason in support of this contention. We are unable to find any error here. Street landscaping policy is a matter within the discretion and expertise of the Zoning Commission.

difficult, and it impinges on public space on 19th Street." (Finding 20). But the Commission rejected this argument and found specifically that "the park will be open and inviting, and that the PUD will serve to implement the 19th Street plan." *Id.* This finding is supported by the evidence.

In sum, we conclude that the Commission did consider all the material issues raised by petitioner, and that its findings are supported by substantial evidence. These "subsidiary findings of basic facts" in turn support the Commission's conclusions of law and its decision to grant the PUD. *See American Trucking, supra* at 334; *Citizens Association of Georgetown v. District of Columbia Zoning Commission*, D.C.App., 402 A.2d 36, 41–48 (1979). It does not matter that these conclusions do not parrot the regulatory guidelines, as long as they flow rationally from the findings of fact and they support the Commission's decision. We conclude that they do.

*Affirmed.*