**DARO REALTY, INC. and Dupont Circle Citizens Association, Petitioners,**

v.

**DISTRICT OF COLUMBIA ZONING COMMISSION, Respondent,**

**Fourways of Washington, Inc., Intervenor.**

No. 88–737.

District of Columbia Court of Appeals.

Argued Oct. 5, 1989.
Decided Sept. 7, 1990.

Richard B. Nettler, Baltimore, Md., for petitioners.

Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., filed a statement in lieu of brief, for respondent.

Louis P. Robbins, with whom Whayne S. Quin and Andrea P. Salley, Washington, D.C., were on the brief, for intervenor.

Before ROGERS, Chief Judge, and NEWMAN and FERREN, Associate Judges.

NEWMAN, Associate Judge:

Petitioners appeal an order by the Zoning Commission ("Commission") rezoning a 14,-000 square foot parcel near Dupont Circle from R–5–B, medium density general residence, to R–5–C, medium-high density general residence. The parcel is owned by Intervenor, Fourways of Washington, Inc. ("Fourways") and is the site of a national historic landmark building known as the Fraser Mansion, where Fourways operated a now defunct restaurant. Under the terms of the Commission's order, the restaurant was to continue to operate, as be-fore, under a lawful nonconforming use, and Fourways was to erect an attached seven-story apartment building, which was approved by the Historic Preservation Review Board ("HPRB"), on an existing parking lot. Petitioners contend, among other things, that the order constitutes illegal spot zoning and that the Commission's findings are not supported by the record. We disagree and affirm.

I

Intervenor, Fourways, owns a 14,000 square foot parcel near Dupont Circle, which includes a four-story building known as the Fraser Mansion at 1701 20th Street, N.W. The building has been used as a restaurant since 1932. In 1958, the property was rezoned from commercial to R–5–B, medium density general residency. However, the commercial use of the building was continued as a lawful nonconforming use. In 1974, the building was placed on the National Register of Historic Places; all subsequent changes to its exterior and new construction are therefore governed by the Historic Landmark and Historic District Preservation Act ("Preservation Act").[1] Fourways purchased the property in 1981 for $2 million, spent another $3 million in renovations, and opened the Fourways Restaurant in October 1982.

Fourways had difficulty making a go of the restaurant and, in 1985, sought refinancing to pay off existing debts. In order to make the property more attractive to potential lenders, Fourways sought to remove the building's nonconforming use by having the parcel rezoned for commercial use and erecting a six-story apartment building on the portion of the parcel now used as a parking lot. The proposed building required the approval of the Historic Preservation Review Board. After asking to see five-story and seven-story versions of the building, the HPRB determined that the latter would make a better transition between the four-story Fraser Mansion and adjacent high-rise apartment buildings and approved the seven-story design in the Fall of 1986. Meanwhile, Fourways applied to

1. D.C. Law 2–144, D.C.Code §§ 5–1001 to –1023 (1988).

the District of Columbia Zoning Commission for a zoning change from R–5–B, medium density general residence, to C–3–B, medium bulk major business and employment center commercial use. In support of its application, Fourways recorded a Declaration of Covenants restricting use and development of the property and naming the District of Columbia and residential neighbors within 75 feet of the property as beneficiaries.

Following public hearings, during which the application was opposed by the Office of Planning ("OP") and various neighborhood groups, the Commission denied the application on July 13, 1987, citing inconsistency with the District's Comprehensive Plan, adverse impact on the surrounding neighborhood, and failure to serve public welfare as factors in its decision. *See* Zoning Commission Order ("Z.C. Order") No. 537 (July 13, 1987). On September 3, 1987, Fourways filed a motion for reconsideration, with a revised covenant and three alternative proposals: (1) to grant C–2–B zoning with a new covenant addressing community concern about hotel use by restricting the proposed building to residential use, (2) C–2–B zoning with a different covenant precluding hotel use and limiting uses of the Fraser Mansion, and (3) split-zoning the parcel to provide C–2–B zoning for the portion containing the Fraser Mansion and R–5–D zoning on the remainder to allow high-density residential development. At a public hearing, the OP testified in favor of the second proposal, citing the change to C–2–B zoning and the amended covenant as providing adequate protection against future development. Neighborhood groups continued their opposition. The Commission was set once again to deny the application, although it had not yet issued a final decision, when counsel for Fourways proposed as an alternative that the Commission grant a change from R–5–B to R–5–C, medium-high density general residence, or R–5–D, high density general residence zoning.

The Commission reopened the record and asked the OP and the other parties in the case for comment on the new request. After receiving letters from Fourways, Advisory Neighborhood Commission 2–B, Dupont Circle Citizens Association, Residential Action Coalition, Citizens Coalition Against Commercial Encroachment off Dupont Circle, and Daro Realty, Inc., the Commission voted to approve the request and rezone the parcel to R–5–C, medium-high density general residence. In doing so, the Commission found that the proposed building was not inconsistent with the District's Comprehensive Plan, and that it would contribute to the housing stock without adversely affecting the surrounding community. Petitioners filed an appeal.[2]

During the pendency of the appeal, the creditors of Fourways filed a petition for involuntary relief under Title 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Columbia. The bankruptcy court granted that request on September 14, 1989. *In re Fourways, Inc.*, No. 89–00675 (September 14, 1989).

We heard oral argument on October 5, 1989, following which we remanded the record to the Commission "to specify the terms, conditions and legal effect of the referenced covenant" and "for clarification of Finding 23 as to whether the use desired by the applicant can be achieved under current R–5–R zoning." *Daro Realty, Inc. v. District of Columbia Zoning Comm'n*, No. 88–737 (Order, November 6, 1989). The Commission responded with Z.C. Order No. 555–A (March 12, 1990), in which the Commission addressed our questions.

On March 20, 1990, one of Fourways creditors, the National Bank of Washington ("NBW"), filed a motion with the Bankruptcy Court for the District of Columbia in the above mentioned involuntary bankruptcy proceeding requesting authority to foreclose on the property at issue here.[3]

---

**2.** Daro Realty, Inc. and Dupont Circle Citizens Association ("DCCA") are the petitioners in this appeal.

**3.** In June 1990, the bankruptcy court approved a consent order, pursuant to which the automatic stay provisions of 11 U.S.C. § 362(a) would be vacated and NBW would be given authority to

## II

Petitioners make four main arguments in this appeal: (A) that the Commission's rezoning order constitutes illegal spot zoning; (B) that the Commission's rezoning order is not supported by substantial evidence in the record and is not accompanied by the requisite findings of fact and conclusions of law on each material contested issue of fact; (C) that the Commission's findings regarding the effects of Intervenor's covenants are deficient; and (D) that the Commission erred by declining to hold a hearing on Intervenor's second request for reconsideration. We find no merit in these arguments and affirm.

## A

 We have defined spot zoning as the "wrenching" of a small parcel from its environment for the benefit of a single owner and without benefit to the public at large or the area affected,[4] and have adopted a two-pronged test:

To constitute illegal spot zoning, the Commission's action (1) must pertain to a single parcel or a limited area—ordinarily for the benefit of a particular property owner or specially interested part—and (2) must be inconsistent with the city's comprehensive plan, or if there is none, with the character and zoning of the surrounding area, or the purposes of zoning regulation, i.e., the public health, safety, and general welfare.

*Citizens Ass'n of Georgetown, supra,* 402 A.2d at 39–40. Petitioners have the burden of showing that both prongs of the spot zoning test are met.[5]

To date we have issued four decisions on spot zoning.[6] All four involved the rezoning of small parcels of land to the benefit of single property owners and, thus, in all four the first prong of the test was satisfied. However, we affirmed the Commission in each case, because the petitioners failed to satisfy the second prong by showing that the rezoning either was inconsistent with the comprehensive plan and/or surrounding environment or that it failed to serve the purposes of zoning by contributing to the public welfare.[7]

---

sell Fourways' property at a public sale, unless Fourways could obtain a non-contingent contract for the sale of the property for an amount at least equal to its debt to NBW. We have been informed that Fourways is currently considering an offer to purchase the property and that a foreclosure sale, originally scheduled for August 14, 1990, is now scheduled for September 12, 1990. In response to our request for supplemental briefing, all parties have submitted memoranda acknowledging that the automatic stay provisions of 11 U.S.C. § 362(a) do not apply here and therefore do not stay the instant appeal.

4. *Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n,* 402 A.2d 36, 39–40 (D.C.1979); *Lee v. District of Columbia Zoning Comm'n,* 411 A.2d 635, 641 (D.C.1980).

5. *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n,* 355 A.2d 550, 560 (D.C.), *cert. denied,* 429 U.S. 966, 97 S.Ct. 396, 50 L.Ed.2d 334 (1976).

6. *Lee, supra,* 411 A.2d 635; *Citizens Ass'n of Georgetown, supra,* 402 A.2d 36; *Rock Creek East Neighborhood League, Inc. v. District of Columbia Zoning Comm'n,* 388 A.2d 450 (D.C. 1978); *Palisades Citizens Ass'n, Inc. v. District of Columbia Zoning Comm'n,* 368 A.2d 1143 (D.C. 1977).

7. All four cases were decided before the District adopted a comprehensive plan. In *Palisades,* we affirmed an order rezoning a parcel from single-family to row house dwellings, on grounds that the order was supported by an "adequate basis for the conclusion that the zoning accords with the comprehensive zoning plan." *Palisades, supra,* 368 A.2d at 1147. In *Rock Creek,* we affirmed an order rezoning a parcel from single-family to row house dwellings on the same basis, holding that the Commission did not have to show a change in the surrounding environment or a mistake in the original zoning to support the change. *Rock Creek, supra,* 388 A.2d at 451. In *Citizens Ass'n of Georgetown,* we affirmed an amendment of the zoning map to permit the enlargement of a supermarket, on grounds that the enlargement was not out of harmony with the surrounding environment and served the general welfare goals of zoning—*e.g.,* increasing the tax base and enhancing food services in the city—as was found by the Department of Economic Development in support of the amendment. *Citizens Ass'n of Georgetown, supra,* 402 A.2d at 40. In *Lee,* we affirmed an order rezoning two lots from single-family to row house dwellings on grounds that an increase in housing stock served the public welfare. We also took judicial notice of the District's housing shortage. *Lee, supra,* 411 A.2d at 642.

This case is indistinguishable from our four previous spot zoning cases. As in those cases, the first prong of the spot zoning test is satisfied—the order rezones a single parcel, which will benefit a single property owner—and, the second prong is not satisfied—the Commission properly has found that the change is not inconsistent with the District's Comprehensive Plan and that it will benefit public welfare by increasing the housing stock without an "adverse effect upon the surrounding community."[8] Therefore, our holding in *Citizens Ass'n of Georgetown* applies equally well in this case:

> In summary, while the ... amendment does affect a limited area to the advantage of a single owner, it is not out of harmony with the comprehensive plan, with the character of the surrounding property, or with the purposes of zoning regulation. The Commission's action, therefore, does not amount to illegal spot zoning; the [rezoned property] has not been "wrenched" from its surroundings.

402 A.2d at 40.

Petitioners would distinguish this case from its four predecessors on grounds that (1) the parcel of land at issue is smaller than those involved in the preceding cases; (2) the parcel of land at issue is "not vacant or being developed with similar existing uses," as was the case in the preceding cases; and (3) unlike the owners in the other cases, Fourways was motivated to seek rezoning by its pressing financial problems. In addition, Petitioners contend that the record does not show public need for rezoning and does not support the Commission's findings of consistency with the District's Comprehensive Plan. We consider these arguments seriatim.

### Size of the parcel.

The size of the parcel is relevant only to the first prong of the test. As in the four previous cases, it is the second prong which is in issue here, and Petitioners do not indicate how the size of the parcel helps satisfy the second prong.

**8.** *Z.C. Order No. 555,* Finding 23.

### The parcel is not vacant.

We fail to see the relevance of the fact that the parcel in question is not vacant. If Petitioners mean to suggest that vacant lots have some quality that places them above parking lots, for purposes of determining whether their development would serve the public welfare and be consistent with the comprehensive plan, they fail to present a convincing argument.

We also fail to see the relevance of Petitioners' point that Fourways' parcel is not "being developed with similar existing uses." Taking this to be a reference to *Citizens Ass'n of Georgetown, supra,* 402 A.2d 36, which involved a plan by Safeway to expand an existing supermarket, we assume Petitioner's point must be that, unlike Safeway, Fourways did not seek rezoning in order to expand its existing restaurant, which Petitioners suggest would be a "similar existing" use, but rather it did so in order to put its parcel to an entirely new use, *i.e.*, to transform it from parking lot to apartment building. But Petitioners fail to explain why this should so distinguish this case from *Citizens Ass'n of Georgetown* as to require a different result. Even if it could be said that the benefit to Fourways is greater than that to Safeway in that Fourways is allowed to embark on a completely new use of its land, *i.e.*, housing, Petitioner's point merely helps satisfy the first prong, by showing benefit to a single property owner.

### The owners seek rezoning to relieve financial burdens.

We see no reason to differentiate between owners seeking rezoning in order to carry out their normal business activities, *e.g.*, developers of row houses, and those who seek rezoning in order to meet financial obligations. Once again, we do not see how this concern transcends the first prong to help satisfy the second prong. The first prong assumes that property owners seeking rezoning are also seeking, and probably receiving, home benefit. We fail to see that it makes any difference that the owner

uses that benefit to stave off financial ruin, as opposed to expanding a supermarket or financing its next development project. What matters is that the rezoning serves the public welfare and the comprehensive plan, which is precisely the focus of the second prong on the spot zoning test. No amount of scrutiny or second-guessing of a property owner's motives for seeking rezoning will help us make that inquiry.

### Public need for rezoning.

■ The Commission found that the public welfare would be served by rezoning because Fourways' proposed structure would contribute to the housing stock and help relieve the District's housing shortage.[9] Petitioners contend that Fourways can erect its proposed apartment building on its parcel as a matter-of-right, without rezoning, and that thus the public welfare is not served by rezoning the parcel. This contention is supported by an earlier Commission finding, issued in its August 1987 Order denying Fourways' rezoning application,[10] and by a March 1987 memorandum to the Commission from Walter J. Cohen, Deputy Administrator of the Department of Public Works, concluding that Fourways could build a 35–unit apartment building without rezoning. But Cohen's conclusion, upon which the Commission seemed to rely for its earlier finding, was based upon use of the entire parcel, which would mean that Fourways would have to demolish the Fraser Mansion, a national historic landmark, in order to build that 35–unit apartment building. The unlikelihood that Fourways

could obtain approval to tear down the Fraser Mansion is self-evident and adequately supports the Commission's later finding that rezoning will make a contribution to the housing stock possible.[11]

### Consistency with the Comprehensive Plan.

■ Petitioners contend that rezoning is inconsistent with the comprehensive plan[12] on three grounds: (1) that it violates the objectives set forth in the Land Use Element[13] of conserving stable neighborhoods and directing new development to neighborhoods in need of improvement, (2) that it violates the open space policies of Preservation and Historic Features,[14] and (3) that it violates the Housing Element objective of promoting the production of low income housing in the District.[15] The record supports the Commission's findings on the first two points, and we find the third meritless.

■ As to preserving Dupont Circle as a stable neighborhood, the Commission examined such matters as traffic, parking, and the effects of commercial and residential development in the Dupont Circle area. It heard from a number of different sources, including the OP, neighbors in support of Fourways' application, Fourways' experts, and the Petitioners. The record contains ample evidence from which the Commission reasonably could conclude that the proposed building would not be inconsistent with the stability of the Dupont Circle area. This evidence includes: (1) testimony by Martin Weider, Gerard

9. *Z.C. Order No. 555,* Finding 23.

10. *Z.C. Order No. 537,* Finding 29: "The housing proposed by the applicant can be achieved as a matter-of-right."

11. *Z.C. Order No. 555,* Finding 23: "that the proposed zoning district with the covenant would contribute to the housing stock, and at the same time not have the adverse effect upon the surrounding community which could result from a less restrictive zone category. Furthermore, the Commission notes that the subject site is historic and that it is protected by the District's Historic Preservation regulatory scheme."

12. *See* 10 D.C.M.R. § 101 (1989); 10 D.C.M.R. Chapter 11 (1989).

13. 10 D.C.M.R. § 1102 *et seq.* (1989).

14. 10 D.C.M.R. § 805.10 (1989): "In additional development [around historic properties] is permitted, sufficient open space should be retained to protect the essential integrity of the particular historic property and its sense of setting."

15. Petitioner's plea for low-income housing has a hollow ring. It does not appear from the record that they ever raised the need for low-income housing in Dupont Circle before, nor that they asked Fourways to provide any. Rather, it appears from the record that Petitioners were asking that Fourways not put up any housing at all.

Holcomb, and Peter Carley that the proposed building would be an aesthetic asset to the area; (2) testimony by the Department of Public Works and Fourways' traffic consultant, Robert Morris, that the building could be accommodated with minimal increase in traffic and parking demand; (3) testimony by the OP that the proposed building would represent a transitional use between the Fraser Mansion and the adjacent high rise buildings and that the covenant provided "needed controls" for the additional development of the site; (4) approval of the building's design by the HPRB; and (5) the testimony of Fourways' expert land planner, David Sher, that the bulk of the proposed building would be compatible with the neighborhood and would be in keeping with adjacent buildings. The Commission's judgment on such issues need only be supported by substantial evidence and be rationally related to the evidence.[16] Although the Commission heard evidence to the contrary, it is not required to explain why it valued one witness or statistic over another.[17]

■ As to the open space and historic preservation issue, the Commission had before it the HPRB's approval of Fourways' seven-story design, a design requested by the HPRB from Fourways as part of the HPRB's inquiry into which of several designs would make the best transition between the four-story Fraser Mansion and adjacent high-rise apartment buildings. The adoption of the design approved by HPRB would suffice since the Comprehensive Plan requires that:

> Open space traditionally associated with privately owned properties, such as yards, gardens, and large estate grounds should be retained whenever possible. If

additional development is permitted, sufficient open space should be retained to protect the essential integrity of the particular historic property and its sense of setting.

19 DCMR § 805.10 (1989).

■ Finally, as to the promotion of low-income housing, we conclude that this is not a material issue here.[18] Although on a previous occasion we have taken judicial notice of the housing shortage in the District,[19] we have never had occasion to require the Commission to differentiate between contributions to low, middle, and upper income housing when determining whether rezoning will be in the public interest. Here, since Petitioners did not raise this issue before the Zoning Commission, we have no basis for addressing it here. *See Rhema Christian Center v. District of Columbia Board of Zoning Adjustment,* 515 A.2d 189 (D.C.1986). Up until now, the fact that a proposed development will add housing units to the District has been enough to support the soundness of Commission findings that the public welfare is being served.

For the foregoing reasons, we conclude that the Commission's rezoning order does not constitute illegal spot zoning.

### B

■ D.C.Code § 1–1509(e) (1981) mandates that administrative agencies accompany decisions in contested cases with written findings of fact and conclusions of law. Moreover, § 1–1509(e) requires that findings of fact and conclusions of law be supported by "reliable, probative, and substantial evidence."[20] However, this Court

---

16. *Roumel v. District of Columbia Bd. of Zoning Adjustment,* 417 A.2d 405, 407 (D.C.1980).

17. *Citizens Ass'n of Georgetown, supra,* 402 A.2d at 47.

18. *Lee, supra,* 411 A.2d at 638 (Commission must make findings of fact only on material issues; material issues are those necessary to an agency's decision-making process).

19. *Id.* at 642.

20. In *Lee, supra,* we outlined the "substantial evidence" requirement as follows:
 First, the findings must address each material contested issue of fact. *Dietrich v. Board of Zoning Adjustment,* D.C.App., 293 A.2d 470, 472–73 (1972). Second, there must be sufficient evidence to support the factual findings made, i.e., "such relevant evidence as a reasonable mind might accept as adequate...." *Vestry of Grace Parish v. Alcoholic Beverage Control Board,* D.C.App., 366 A.2d 1110, 1112 (1976) (citation omitted). Finally there must be a rational connection between the findings

has stated that an issue does not become material simply because it was raised at a hearing and evidence was offered on the point. *Lee, supra,* 411 A.2d at 638; *Wheeler v. Bd. of Zoning Adjustment,* 395 A.2d 85, 88–89 (D.C.1978). The issue must have been one that the agency had to consider as part of its decision-making process. *Lee, supra,* at 638; *Wheeler, supra,* at 88–89.

Petitioners contend that the Commission's findings do not adequately respond to the following issues, which Petitioners regard as material: (1) that Fourways could increase the residential housing stock without rezoning, as a matter of right; (2) that new construction would exacerbate traffic congestion in the area; (3) that the proposed building would block the light and air of adjacent residences and diminish their market value; and (4) that the rezoning order is inconsistent with the Commission's recent acts to "downzone" the area. We address these issues seriatim.

### Contributing to the Housing Stock without Rezoning.

■ The issue of Fourways' ability to erect its proposed building as a matter-of-right was presented to the Commission by Petitioners. Walter J. Cohen, Deputy Administrator of the Department of Public Works, concluded that Fourways could build a 35–unit apartment building on the site as a matter-of-right, if it used the entire site. However, in order to use the entire site, Fourways would have to demolish the Fraser Mansion, a historic landmark.

The Commission responded to this issue in Finding 23 of *Z.C. Order No. 555.* Noting the restrictions placed upon development of the property by the status of its existing structure as an historic landmark and the need for obtaining HPRB approval of any building plans, the Commission concluded that "the proposed zoning district with the covenant would contribute to the housing stock, and at the same time not have the adverse effect upon the surrounding community which could result from a less restrictive zone category." Petitioners contended that this finding was unresponsive, because it addressed the result from "a less restrictive zone category", *i.e.,* Fourways' original application for commercial zoning, rather than the result from building on the property's existing zone category.

On remand, we ordered the Commission to clarify this finding and, in *Z.C. Order No. 555–A,* the Commission found that "Lot 60 is currently developed by the 1.1 FAR of the Fraser Mansion." From this finding the Commission concluded that "[t]he residential use that is proposed is a permitted use in the R–5–B District, but the 1.8 FAR that applies in the R–5–B zone would not allow a significant increase in the development of Lot 60. The R–5–C zone FAR is 3.5. The additional FAR permitted under R–5–C zoning is appropriate to provide for a reasonable level of residential development." *Id.* at 4.

Based on this finding, we are now satisfied that the Commission's conclusion that Fourways could not attain a "reasonable level of residential development" as of right under Lot 60's current zoning is supported by the record. Under its current zoning, Lot 60 has a 1.8 FAR limit, of which 1.1 FAR is taken up by the Fraser Mansion, a national historic landmark. Thus, unless the Fraser Mansion were torn down—which is not a realistic option given its status—Fourways is left with .7 FAR under current zoning. We see no basis for overruling the Commission's conclusion that .7 FAR is not enough to permit a "reasonable level of residential development," especially in view of the landmark status of the building now on the property and the strictures of gaining HPRB approval for any development on the site.

### Traffic.

■ In *Z.C. Order No. 537,* Finding 24, the Commission found that while Fourways' proposal to rezone for commercial

made by the agency and the decision it reaches. *Brewington v. Board of Appeals and Review,* D.C.App., 299 A.2d 145, 147 (1973).

411 A.2d at 638.

**304**

use would have an adverse impact on traffic, "[s]ome incremental increase [in development], and a corresponding increase in the traffic and parking demands generated by the site would not be unreasonable." This finding is supported by testimony from the Department of Public Works that Fourways' proposed building would generate minimal increase in traffic and parking demand. Since the Commission did not speak to this issue in *Z.C. Order No. 555*, which granted Fourways' rezoning application, we infer that any increase in traffic generated by the proposed structure would fall under the reasonable incremental increase mentioned in *Z.C. Order No. 537*. Although we have refused to infer a finding where no specific finding was made, *Lee, supra,* 411 A.2d at 639, we are willing to make inferences from general findings, such as those in *Z.C. Order No. 537*, when they are "sufficiently detailed so as to provide this court with the 'basic [and] underlying reasons' for the conclusions entered by the Board in making its decision." *Wheeler, supra,* 395 A.2d at 88 (quoting *Palmer v. District of Columbia Bd. of Zoning,* 287 A.2d 535 (D.C.1972)). We conclude that the Commission's traffic findings in *Z.C. Order No. 537*, specifically the permissibility of incremental increases generated from incremental development, are sufficient for this purpose.[21]

### Blockage of Light and Air of Adjacent Residences.

 We see no merit in this argument.[22] The seven-story building design approved by the HPRB included set-backs from the Rodney Apartments; these set-backs were also included in the covenant. Such set-backs are not required under either R–5–B or R–5–C zoning. Moreover, pursuant to 11 DCMR § 405.6, side yards are not required either. Thus, the building proposed by Fourways and subject to the set-backs, as well as any building proposed

by a subsequent owner of Lot 60, would be less restrictive of light and air than what would otherwise be permitted as of right. Though the Commission does not make specific findings of fact regarding this issue, we here once again can infer from the Commission's general findings, "the 'basic [and] underlying reasons'" *supra,* 395 A.2d at 88.

### The Commission's Recent Acts to "Downzone" the Area.

 Petitioners contend that the Commission's rezoning order contradicts its recent acts to "downzone" the area. Although it is true that the Commission rezoned the area from R–5–C to R–5–B to stabilize the neighborhood, it did so in May 1974. This can hardly be called recent. It is not unreasonable that the Commission could decide that after fifteen years the neighborhood had been sufficiently stabilized to permit the "upzoning" of one parcel. Again, we can infer from the Commission's general findings, the underlying reasons supporting the Commission's final decision. *Id.*

### C

 Fourways filed a covenant restricting the use, height, bulk, and set back of its property, naming the District of Columbia, J. Phillip Sherwood, and all residential property owners within 75 feet of its property as beneficiaries. Later, Fourways twice amended this covenant, removing the District as beneficiary and adding additional restrictions.

Petitioners contend that this covenant is inadequate to restrict improper commercial development in the area and that the Commission's reliance on it is misplaced because interested parties have not executed the covenant. Specifically, Petitioner points to J. Phillip Sherwood, who has since sold his property and moved from the Dis-

---

21. We note that nothing in Z.C. Orders 555 and 555–A affects the finding in Z.C. Order 537 regarding the effect of traffic.

22. We note that Fourways first proposed a six-story building to the HPRB, which responded by asking Fourways to submit five and seven-story

designs. The HPRB approved the seven-story building, finding the five-story design to "compete visually with the Fraser Mansion" and to be "less successful [than the seven-story design] as an integral part of the street-scape."

trict, and all residential property owners within 75 feet of the property, and the property's tax lienholders, the District of Columbia and the United States. With respect to the latter, Petitioners argue that if foreclosure and a tax sale were to occur, any subsequent purchaser of the property would not be bound by the covenant and could erect a structure twice the size of the one proposed by Fourways.

On remand, we ordered the Commission to specify the terms, conditions and legal effect of the covenant. In *Z.C. Order No. 555–A*, the Commission did so. We are now satisfied that the record supports the Commission's reliance on the covenant with respect to both issues raised by Petitioners.

*Reliance on the covenant.*

The record indicates that the covenant affords substantial protection against future commercial development.[23] Although the residential property owners within 75 feet of Fourways' property, including Petitioner, Daro Realty, Inc., did not join in executing the amendments, the amendments retained all earlier restrictions and added more.[24] The amended covenant specifically names J. Phillip Sherwood and his "successors, heirs, executors, administrators, and assigns" as beneficiaries, thus making irrelevant for purposes of enforcing the covenant Sherwood's sale of his property. The covenant may also be enforced by the owner of the Rodney Apartment building, which abuts Lot 60.[25] In addition, the covenant runs with the land until December 30, 2017, binding all future owners to these added restrictions. *See Capital Hill Restoration Soc. v. Zoning Commission*, 380 A.2d 174, 184 (D.C.1977) (covenant running with land is generally

enforceable). While it is true that the residential property owners within 75 feet of Fourways' property, did not sign the amendments, the Commission decided that these signatures were not necessary and we see no reason to second guess the Commission's judgment regarding this issue.

Moreover, the Commission was advised by the Corporation Counsel that the covenant was enforceable, and the OP, which had initially opposed rezoning the property, dropped its opposition and supported the application based on the protections against future development afforded by the covenant. In light of these conditions, terms, and legal effects, we conclude that the Commission reasonably could rely on the protections afforded by the covenant. *Id.* at 185 (Zoning Commission may consider covenants in rezoning decision because "private restrictions may provide greater flexibility and control in meeting the demands for rezoning in areas which have undergone recent changes.").

*Dangers posed by a forced sale.*

Petitioners hypothesize a forced sale of the property, due either to outstanding taxes or bankruptcy, or to a new owner who Petitioners fear might be free to put up a building twice the size of the one now proposed. The source of this fear is that the covenant will not take effect until all appeal periods have run. Although the possibility of a forced sale of the property obviously has increased in light of the consent order approved by the Bankruptcy Court of the District of Columbia, see *supra* note 3, we see no merit in this argument.

Even if a buyer were able to purchase the property at a forced sale free of the

---

**23.** In *Z.C. Order No. 555–A*, Finding of Fact 3 the terms of the final covenant along with the amendments are set forth.

**24.** The first amendment provides:
That the existing Fraser Mansion with its proposed small commercial addition shall not be used for the following uses: hotel; automobile laundry; automobile rental agency; billiard parlor or pool hall; blueprinting or similar reproduction service; bowling alley; dental laboratory; funeral mortuary, or under-

taking establishment; general indoor storage; laundry, self service; plumbing or heating shop; ice sales; public bath; streetcar or bus passenger depot; veterinary hospital; automobile and truck sales; boat or other marine sales; pet shop; drive-in type restaurant; fast food restaurant; collection station for dry cleaning, dying, or laundry; or radio or television repairs.
Order 555–A at 3.

**25.** *See Z.C. Order No. 555–A*, Conclusion 1 at 4.

covenant, the landmark status of the structure now on the property provides built-in protection against the sort of improper commercial development Petitioners fear. After all, this is not just any parcel of land; it contains the Fraser Mansion, a national historic landmark. *Any* development on that site will require compliance with the Preservation Act and the approval of the HPRB, and such approval is not likely to be granted lightly or quickly. At the very least, any new development would have to leave the Fraser Mansion intact, which in itself limits the amount of development allowable as a matter of right. Moreover, any new development also would have to complement the Fraser Mansion and the surrounding environs from the viewpoint of the HPRB. Given the concerns expressed by the HPRB in this case about the transition between the Fraser Mansion and surrounding buildings and the overall character and appearance of the "streetscape," we conclude that the specter of a new owner erecting a building twice the size of the one now proposed by Fourways is speculative at best.

In addition to the development restrictions inherent in the property itself, there is the added protection of due process. If the present case is any indication of the normal processes of obtaining HPRB approval, and we see no reason to doubt that it is, approval would require a thorough examination of the proposed development by the HPRB. That examination would take time and, thus, the Commission would be in a position to take steps during its pendency to restrict new development.

■■■ Therefore, given these built-in protections, the Commission reasonably could conclude that the possibility of a forced sale did not threaten to undo the safeguards of the covenant.[26]

**D**

■■■ In December 1987, as the Commission was set to deny the three proposals Fourways had submitted for reconsideration in September, Fourways offered a new proposal and the Commission, without issuing a final order on the pending proposals, reopened the record. Petitioners contend that this action by the Commission violated 11 D.C.M.R. § 3029.5, which states:

> a motion for reconsideration, rehearing or reargument of a final decision in a contested case proceeding under § 3022 may be filed by a party within ten (10) days of the order having become final.... The Commission shall not receive or consider any motion for reconsideration, rehearing, or re-argument of a final decision in a contested case proceeding that is filed prior to the order having become final.

11 D.C.M.R. § 3029.5 (1989). Petitioners contend that by reopening the record and calling for comments on Fourways's proposal, Petitioners were denied "a trial-type hearing on material issues of fact."

■■■ The Commission viewed the matter differently. In Finding 14 of *Z.C. Order No. 555*, the Commission stated that counsel for Fourways requested the Commission to "reconsider the proposed decision to deny the application." When dealing with proposed, or non-final decisions, the Commission may reopen the record and hear further evidence. As 11 D.C.M.R. § 3024.4 (1989) states: "The Commission reserves the right to reopen the record at any time prior to the issuance of a final decision. In a [contested case] proceeding ..., notice of reopening the record shall be served upon all parties to the proceeding." As 11 D.C.M.R. § 3025.1 (1989) adds: "Prior to filing the final decision, the Commission may on its own motion reopen the record and require further hearing on designated issues before the Commission." Thus, the Com-

---

**26.** Of course, once the covenant takes effect, it will be binding upon a new purchaser, even at a forced sale. As a general rule, a buyer at a judicial or execution sale acquires the same title held by the debtor at the time the judgment or lien attached. 5B THOMPSON ON REAL PROPERTY, § 2756 (1978). Moreover, a buyer at an execu-

tion sale is deemed to take with notice of the debtor's right, title, and interest, *Reagan v. Dick,* 88 Colo. 122, 293 P. 333, 334 (1930), and thus cannot claim to have taken without notice of existing encumbrances in the manner of a bona fide purchaser. *Torrance v. Castner,* 46 Cal. App.3d 76, 120 Cal.Rptr. 23, 25 (1975).

mission properly exercised a power specifically granted to it to reopen the record before issuing a final decision. Moreover, the Commission provided notice to Petitioners and all other interested parties.

Finally, Petitioners contend that the Commission should have held hearing on the issue of whether rezoning the site from 5-5-B to R-5-B would make use of the site by a chancery more likely and, thus, deprive the Fraser Mansion of its protection under federal and local preservation laws. Petitioners point to D.C.Code § 5-1206(b)(2) (1988), which provides that "[a] chancery shall be permitted to locate: (A) In any area which is zoned medium-high or high density residential...." Petitioners contend that they were never given a chance to present evidence that under existing regulations a chancery could not locate in the Fraser Mansion if its zoning remained R-5-B, because of its existing uses, but that a chancery could locate there if it were rezoned to R-5-C. They also contend that the Commission should have looked further into the issue of whether federal and local preservation laws apply to buildings once they become chanceries.

The chancery issue was presented to the Commission for the first time during the post-hearing phase of the case in a February 1988 letter to the Commission from Petitioner, Dupont Circle Citizens Association. The Commission sought the Corporation Counsel's advice on the matter. The Commission stated the Corporation Counsel's advice in Finding 33 of *Z.C Order No. 555:*

(1) in chancery proceedings, the Foreign Missions Board of Zoning Adjustment has the sole authority to determine historic preservation issues; (2) in this determination, the Board is charged with ensuring substantial compliance with District and Federal legislation which govern historic preservation; and (3) the Board is also authorized by the Foreign Missions Act to determine whether the site of a proposed chancery is within an area "determined on the basis of existing uses, which includes offices or institutional uses ...," albeit the area is not zoned Diplomatic."

Relying on the Corporation Counsel's advice the Commission did not hold any further hearings on the chancery matter.

Petitioners disagree with the Corporation Counsel's advice, asserting that it conflicts with the positions taken by other District of Columbia and federal agencies. However, Petitioners do not identify these agencies. They contend that on the basis of these conflicts and other "doubts," the Commission should have looked further into the issue by holding a trial-type public hearing. Petitioners contend that they have a right to contest the Corporation Counsel's advice in such a hearing under D.C.Code § 1-1509(b) (1988), which provides in relevant part that "[e]very party shall have the right to present in person or by counsel his case or defense by oral and documentary evidence, to submit rebuttal evidence, and to conduct cross-examination as may be required for a full and true disclosure of the facts."

Because the section upon which Petitioners rely specifically refers to "oral and documentary evidence," their argument hinges on whether or not legal advice received from the Corporation Counsel is evidence. We conclude that it is not. 11 D.C.M.R. § 3024.5 (1989) provides that "[l]egal advice from the Office of the Corporation Counsel may be requested or received at any time." Since this section applies even when the record has been closed, we conclude that it removes such legal advice from the category of contestable evidence.[27]

*Affirmed.*

---

**27.** "We accord great deference to an agency's interpretation of its own administrative regulations, and we will uphold that construction un- less clearly erroneous or inconsistent with the regulations." *Dupont Circle Citizens Ass'n v.*

*District of Columbia Zoning Comm'n,* 431 A.2d 560, 565 (D.C.1981).